STATE OF NORTH CAROLINA v. MICHAEL IVER PETERSON

No. 547A06

(Filed 9 November 2007)

## 1. Evidence— seizure under inadequate search warrant—admission not prejudicial

Any error in a prosecution for first-degree murder in the admission of evidence of motive seized from defendant's computers and related material pursuant to an invalid search warrant was harmless beyond a reasonable doubt. The prosecution presented copious amounts of evidence relating to the elements of first-degree murder, as well as to motive (which is often important but is not an element).

## 2. Evidence— similar death—similarities sufficient

The trial court did not err in a first-degree murder prosecution by admitting evidence concerning a similar death where the court's findings indicate significant similarities between the two events and sufficient circumstantial evidence that defendant was involved in the prior death. Remoteness in time between the two deaths might affect the weight of the evidence, but not its admissibility.

## 3. Criminal Law— prosecutor's closing argument—credibility of State experts—improper but not prejudicial

A prosecutor's closing argument that State's experts were to be believed because they worked for the State of North Carolina was conceded on appeal to be improper, but did not prejudice defendant to the point of a new trial. The offending statements spanned less than five minutes in a five month trial and defendant did not meet his burden of showing, within the totality of the trial and closing arguments, that the outcome would have been different had the court sustained defendant's objection or given a broader curative instruction that applied to these statements.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 179 N.C. App. 437, 634 S.E.2d 594 (2006), finding no prejudicial error in and affirming a judgment entered 10 October 2003 by Judge Orlando F. Hudson, Jr. in Superior Court, Durham County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 10 September 2007.

STATE v. PETERSON

[361 N.C. 587 (2007)]

*Roy Cooper, Attorney General, by John G. Barnwell and William B. Crumpler, Assistant Attorneys General, for the State.*

*Thomas K. Maher for defendant-appellant.*

BRADY, Justice.

Defendant Michael Iver Peterson was found guilty by a jury of the first-degree murder of his wife, Kathleen Peterson. Defendant appealed his conviction to the Court of Appeals, which determined, in a divided opinion, that defendant received a fair trial, free of prejudicial error. Defendant has appealed three issues as of right to this Court on the basis of a dissent in the Court of Appeals. First, we must determine whether the trial court's erroneous admission of evidence seized pursuant to an invalid search warrant was harmless beyond a reasonable, doubt. We hold the admission of the evidence was harmless. Second, we must determine whether the trial court erred in admitting evidence concerning the 1985 death of Elizabeth Ratliff. We hold that the trial court did not err in admitting this evidence. Third, we must determine whether particular statements made during the prosecution's closing argument warrant a new trial. We hold that these statements do not entitle defendant to a new trial. Accordingly, we affirm the decision of the Court of Appeals.

## PROCEDURAL AND FACTUAL BACKGROUND

On 20 December 2001, the Durham County Grand Jury returned a true bill of indictment charging defendant with first-degree murder. Following a lengthy trial that spanned five months, defendant was convicted on 10 October 2003 of the first-degree murder of Kathleen Peterson, and on that same day the trial court entered judgment against defendant and sentenced him to life imprisonment without parole. Defendant appealed to the Court of Appeals, a majority of which affirmed defendant's conviction. However, one judge dissented and would have held that defendant was entitled to a new trial.

Defendant filed a notice of appeal with this Court on 17 October 2006 and contemporaneously filed a petition for discretionary review of additional issues which were not the subject of the dissenting opinion in the Court of Appeals. This Court denied defendant's petition on 25 January 2007.

## State's Evidence

The State presented evidence tending to show that defendant's wife, Kathleen Peterson (the victim), had worked for Nortel Networks nearly seventeen years at the time of her death. During her career at Nortel, she rose steadily through the corporate ranks and by 1999 she held an executive position. The victim was to travel to Canada on 10 December 2001 to meet with Helen Prislinger, a Nortel process analyst. On 7 December 2001, Prislinger telephoned the victim, informed her of a planning conference call that was to take place on 9 December 2001, and told her that on 8 December 2001 Prislinger would inform her of the time of the conference call. On 8 December 2001, Prislinger left messages for the victim indicating the conference call would take place at 10:00 a.m. on Sunday, 9 December 2001. The victim later returned Prislinger's telephone calls and advised her to send a document relating to the conference call via e-mail to an address that Prislinger assumed was defendant's e-mail address.

At 2:40 a.m. on 9 December 2001, Durham Emergency Response received a 911 call from an apparently distressed defendant. He informed the operator that his wife "had an accident" and that she was "still breathing." He told the operator that she had fallen down the stairs and that she was unconscious. In response to questioning from the 911 operator, defendant answered that the victim had fallen down "15, 20 [stairs], I don't know." Defendant terminated the call and then again telephoned 911 moments later and told the operator the victim was no longer breathing. Defendant again disconnected the call.

## Initial Observations of the Crime Scene

First responders arrived at the scene less than eight minutes after defendant made the initial 911 call. When they arrived, defendant's son Todd Peterson, who had just entered the residence, told defendant that the victim was dead and to "step aside, move, the paramedic's [sic] here." Paramedic James Rose testified that there was an "enormous amount of blood" at the scene and "[a] lot of the blood that [was] on the walls [was] dry. The blood under her head was . . . coagulated. It had already clotted and started to harden." He additionally testified that there was dried blood on the stairs and stairwell, and it "looked like it had been wiped away or wiped on. It had been smeared, instead of just blood droplets just soaking down the wall." Defendant told the paramedics "he had just [gone] outside to turn off the lights, and came back in and found her at the bottom of

the steps." While defendant had indicated at 2:41 a.m. to the 911 operator that the victim was still breathing, Rose examined her at approximately 2:50 a.m. and discovered her pupils were dilated six millimeters—indicating a substantial time period in which she was without oxygen. Rose also testified that he had been to thirty or forty incidents involving falls and the worst injury he had observed was a broken neck. He had never "seen wounding to the back of the head like was present in this case."

Paramedic Ron Paige gave similar testimony concerning the amount of blood, and he noted that the blood on the victim's clothes appeared to be dry. Both paramedics indicated that defendant had blood on his shirt and hands. Rose testified that defendant's "shirt was partially blood-soaked with [spatter] spots, there were speckles of blood over his shirt. Blood on his hands and arms, and I believe his legs and feet." Later observation of defendant's clothing indicated blood spatter on defendant's tennis shoes and inside the right leg of his shorts.

Shortly after the arrival of the paramedics and firefighters, a man and a woman were admitted into the residence. According to a first responder, the woman described herself as a "doctor or something." In addition, other individuals entered the residence. Eventually, the first responders determined that the area should be secured until the arrival of police investigators. Therefore, a police officer stationed at the door was instructed to stop all civilian traffic into the residence until it was determined whether the area was a crime scene.

Soon, investigators from the Durham Police Department Criminal Investigations Division arrived at the scene. Sergeant Francis J. Borden noted a large amount of blood and blood spatter. Sergeant Borden and Detective Art Holland conferred after viewing the crime scene and made a decision to apply for a search warrant for the premises. Detective Holland left the scene to obtain the warrant, which was issued by a magistrate. Dan George of the Forensic Services Unit of the City of Durham observed "large quantities of blood all over the floor, all over the victim, her hands, feet, her clothing, the walls, the stair." He also testified that the blood on the stairway "appeared to have either been wiped or smeared."

### Medical and Forensic Evidence

Kenneth Snell, M.D., the local medical examiner, examined the victim's body and discovered a four-inch laceration to the back of the

skull and what appeared to be three or four injuries that may have been caused by a fall. He advised the investigators to look for some sort of instrument that may have been used to cause the lacerations. He was uncertain whether a fall was the cause of the injuries and withheld final determination until an autopsy could be performed. After the autopsy, Dr. Snell opined that the "injuries [were] not consistent with a fall," but were "consistent with an assaultive, beating-type pattern."

North Carolina State Bureau of Investigation Special Agent Duane Deaver was contacted to perform a blood spatter analysis. Dan George, who assisted Deaver, observed a large amount of blood, with the blood being found "on the steps, blood on the risers, blood in the corners . . . blood all over the walls and on the molding, both the inside and out." Forensic unit supervisor Eric Campden also assisted Deaver in his investigation. Campden sprayed luminol, a preliminary indicator of blood, in various portions of the crime scene, being careful not to spray visible blood. Luminol testing revealed barefoot tracks leading to the laundry room and two footprints facing the "janitorial sink." Testing revealed no bloody shoe prints; only bloody barefoot prints were found.

The autopsy of the victim's body was performed by Deborah Radisch, M.D., a forensic pathologist in the Office of the Chief Medical Examiner. She observed multiple blunt traumatic injuries on the victim's body, including bruises, abrasions, and lacerations— many of which were found on the victim's head and face. Dr. Radisch opined that the bruises and abrasions to the victim's face were inconsistent with a fall against a flat surface and that the injuries to her head were primarily found on the back and side of the head. Seven lacerations were present on the back and side of the victim's head, each of which were caused by separate impacts. According to Dr. Radisch, the lacerations were inconsistent with a fall but were consistent with being struck by an object that would have lacerated the flesh without fracturing the skull. While some of the injuries may have been caused by a fall, the collective nature of the injuries was inconsistent with a fall. Dr. Radisch opined that the injuries were consistent with being struck with an object like a blow poke—a fireplace tool—because a blow poke is not solid. The bruises on the victim's arms and hands were considered defensive injuries by Dr. Radisch. In Dr. Radisch's opinion, the victim's death was the result of a homicide, with the cause of death being blunt force trauma to the head and with blood loss as a significant factor. Dr. Radisch testified that she

reviewed two hundred eighty-seven cases in North Carolina involving deaths attributed to falls down stairs and that she particularly studied twenty-nine such deaths in the victim's age range. Of those twenty-nine deaths, seventeen had no scalp lacerations and twelve showed one, as compared to the victim's seven scalp lacerations.

Thomas Bouldin, M.D., a neuropathologist consulting with the Medical Examiner's Office, observed evidence of blunt force trauma to Kathleen's brain. He noted evidence consistent with a significant decrease in blood flow to the victim's brain at least two hours before death, which could have been caused by the extensive bleeding from the lacerations.

## Evidence as to Motive

The prosecution additionally presented evidence of defendant's and the victim's financial situation, including the victim's stress arising from her position at Nortel. The financial evidence indicated that defendant and the victim had more money leaving their accounts than coming in, as well as a substantial amount of credit card debt, and that the victim had significant amounts of life insurance and other assets which would benefit defendant upon the victim's death. The prosecution also presented evidence of defendant's extramarital sexual interests, including e-mails in which defendant attempted to arrange a sexual encounter with a male prostitute.

The trial court also admitted, over defense objections, evidence of the circumstances of the death of Elizabeth Ratliff, defendant's friend who died in the Federal Republic of Germany in 1985. The factual background of this evidence will be more thoroughly discussed in conjunction with our analysis of whether the trial court erred in its admission.

## Defendant's Evidence

Defendant presented testimony from Jan Leestma, M.D., who was tendered as an expert in forensic neuropathology. Dr. Leestma disagreed with Dr. Radisch's opinion and testified that the wounds to the victim's head were more characteristic of impacts upon a relatively flat and immovable surface, such as the stairs; however, he could not completely rule out that the victim sustained the injuries by being struck with an object.

Dr. Henry Lee, a forensic scientist, testified that the scene of the crime was not consistent with a beating-type death. He explained that

medium velocity blood spatter could be caused by a variety of actions, including the coughing of blood. He noted there were over 10,000 blood drops at the scene of the crime, and those drops appeared to be moving in different directions which would be inconsistent with a typical beating. Dr. Lee testified that he saw evidence of blood in the victim's mouth from scene photographs and that some of the blood at the scene may have been caused by coughing.

Dr. Faris Bandak, a professor of biomechanics at George Washington University, testified that, applying biomechanical principles, the victim's injuries were inconsistent with being struck with an object like a blow poke, but consistent with a fall. He explained how various surfaces in the stairway could have caused the injuries found on the victim's head and then utilized a sequence of illustrations to demonstrate how the victim could have fallen backwards after walking up a few of the stairs, stood up after her first fall, and then fallen once again. According to Dr. Bandak, the two falls would have produced four impacts, which would account for the injuries found.

### State's Rebuttal Evidence

John Butts, M.D., the Chief Medical Examiner for the State of North Carolina, testified as a rebuttal witness. He stated that his experience led him to conclude that it would be unusual to find multiple lacerations across the back and top of the victim's head caused merely by a fall. Additionally, Dr. Butts testified that no blood was found in the victim's mouth or airway and that, in his opinion, there was no significant aspiration of blood. Other than a microscopic amount, there was an absence of blood in the victim's lungs, which indicated that it was unlikely she coughed blood.

Dr. James McElhaney, a former professor of biomedical engineering and surgery at Duke University, testified as a rebuttal witness for the prosecution concerning the biomechanics of a possible fall. In his opinion, the injuries were inconsistent with a fall and were consistent with those that might be caused by a beating with a blunt instrument. Dr. McElhaney based his opinion on six factors: (1) location of the lacerations; (2) length of the lacerations; (3) number of lacerations; (4) direction of the lacerations; (5) the velocity of either the victim's head during a possible fall or of an object striking the victim's head; and (6) the amount of energy associated with the injury. Taking these factors into account, Dr. McElhaney opined that while a couple of the lacerations could be attributed to a fall, the other lacerations were not consistent with a fall down the stairs. Moreover,

the velocity which would have been necessary to cause the lacerations during a fall would have been likely to cause skull fracturing. According to Dr. McElhaney, the victim would have had to sustain at least fifteen separate impacts to account for all her injuries.

## ANALYSIS

### I. The Admission of Evidence Seized Pursuant to the Third Search Warrant

[1] Three search warrants authorizing the search of defendant's residence were applied for and issued, one each on 9 December 2001, 10 December 2001, and 12 December 2001. Only the 12 December 2001 warrant (third warrant) is at issue before this Court. Both the majority and the dissent at the Court of Appeals determined that this warrant, which authorized the search and seizure of items of evidentiary value from defendant's "computers, CPUs, files, software, [and] accessories," was "woefully" inadequate insofar as the probable cause affidavit failed to set out sufficient factual allegations to support the affiant's averment that probable cause existed to support issuance of a warrant. 197 N.C. App. at 450, 634 S.E.2d at 606. However, the majority of the Court of Appeals panel found that the erroneous admission of evidence from this search warrant was harmless beyond a reasonable doubt. The dissent disagreed with this conclusion. Accordingly, the sole determination which we must make is whether the admission of evidence obtained by execution of the third search warrant was harmless beyond a reasonable doubt. *See* N.C. R. App. P. 16(b). We conclude that, because the State presented overwhelming evidence of defendant's guilt, independent and separate from the tainted evidence, no reversible error occurred.

Because admission of the evidence illegally obtained through the invalid third search warrant is an error of constitutional magnitude, we must determine whether the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967). The General Assembly has codified this rule and articulated the proper burden of proof as follows: "A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C.G.S. § 15A-1443(b) (2005). One way this Court has determined whether an error is harmless beyond a reasonable doubt is by viewing the totality of the evidence against the defendant and determining if the in-

dependent non-tainted evidence is "overwhelming." *See State v. Tirado*, 358 N.C. 551, 581, 599 S.E.2d 515, 536 (2004) (citing *State v. Spaulding*, 288 N.C. 397, 407-08, 219 S.E.2d 178, 185 (1975), *vacated in part on other grounds*, 428 U.S. 904 (1976)), *cert. denied*, 544 U.S. 909 (2005). The evidence seized pursuant to the invalid third search warrant pertained to two potential motives: (1) the financial situation of defendant and the victim and stress arising from that situation; and (2) defendant's extramarital sexual interests and dialogue with a male homosexual prostitute.

In order to convict a defendant of premeditated, first-degree murder, the State must prove: (1) an unlawful killing; (2) with malice; (3) with the specific intent to kill formed after some measure of premeditation and deliberation. *See* N.C.G.S. § 14-17 (2005); *State v. Hamby*, 276 N.C. 674, 678, 174 S.E.2d 385, 387 (1970), *judgment vacated in part on other grounds*, 408 U.S. 937 (1972). While motive is often an important part of the State's evidence, "[m]otive is not an element of first-degree murder, nor is its absence a defense." *State v. Elliott*, 344 N.C. 242, 273, 475 S.E.2d 202, 216 (1996) (citing *State v. Gainey*, 343 N.C. 79, 84, 468 S.E.2d 227, 230 (1996), and *State v. Van Landingham*, 283 N.C. 589, 600, 197 S.E.2d 539, 546 (1973)), *cert. denied*, 520 U.S. 1106 (1997). The prosecution in the instant case presented copious amounts of evidence relating not only to the elements of premeditated first-degree murder, but to motives defendant may have had to kill his wife. While the evidence seized pursuant to the third search warrant pointed to motive, the evidence was of a cumulative nature and the non-tainted evidence of the same motives is overwhelming.

The prosecution presented evidence from defendant's computer, obtained pursuant to the third warrant, of e-mails between defendant and Brent Wolgamott, a male prostitute, along with other evidence that defendant had viewed sexually explicit photographs of men and visited pornographic websites. Further, defendant had used computer software designed to scrub information from the computer's hard drive. Defendant asserts that the evidence presented of the e-mail exchanges found on the computer between defendant and Wolgamott must have been used by the jury in determining a possible motive because "there is no evidence that Wolgamott's identify [sic] and knowledge of Defendant was discovered independent of the discovery of the e-mails on the computer." Therefore, defendant argues, "the State cannot carry its burden of proving that the search of the computer was harmless as to the discovery of Wolgamott."

However, contrary to defendant's assertion, the State presented evidence in the form of *printed e-mails* obtained from defendant's desk drawer pursuant to the *prior valid search warrants* that contained not only Wolgamott's e-mail address, but his photograph and telephone number. Additionally, these printed e-mails and photographs were commingled with other important papers through which the victim may have searched, such as an itemized telephone bill and a Nortel Flex Benefit Statement. Also contained in the desk drawer was a printed "review" of Wolgamott's services. The printed e-mails between defendant and Wolgamott indicate that an arrangement for sexual services existed "for the set price." This evidence of defendant's planned sexual encounter with Wolgamott, standing apart from any of the tainted evidence found on defendant's computer, unquestionably established that the victim may have found out about defendant's activity and that this discovery led to an ensuing altercation resulting in the victim's death. The evidence found on the computer was merely cumulative evidence of defendant's sexual proclivities and arranged rendezvous with Wolgamott.

The evidence of the financial stress of defendant and the victim found on the computer was likewise cumulative. E-mails written by defendant indicated that the victim was experiencing stress as a result of company layoffs which her employer called "optimization." Additionally, the e-mails showed defendant requested his former wife's assistance in providing living expenses for his adult son and that defendant asked a Ratliff family relative to assist one of the Ratliff daughters with her educational expenses. The properly admitted evidence of the financial stress in the relationship was extensive and overwhelming. Katherine Kayser of Nortel's Human Resources Department testified that defendant received $346,998.59 from the victim's deferred compensation due to the victim's death, and that defendant claimed another $1,450,000.00 in insurance proceeds which were awaiting final approval by the insurance company. Therefore, Ms. Kayser testified that defendant stood to receive a total of $1,796,998.59 as a result of the victim's death. Moreover, after conducting a financial analysis of defendant's situation, Special Agent Raymond Lawrence Young of the State Bureau of Investigation's Financial Crimes Unit, who is also a certified public accountant, testified as to the cash flow problems present in the household and the couple's substantial credit card debt that surpassed $140,000.00. All of Young's testimony was derived from evidence obtained independently of the evidence seized pursuant to the third warrant. Additionally, the victim's sister, Candace Zamperini, testified exten-

sively concerning the tension the victim was under and how the victim relayed to her that "[a]ll I ever do is talk to [defendant] about the stresses at Nortel. I just don't know how to turn things around." The evidence that financial stress existed in the relationship between defendant and the victim, and that defendant stood to gain from the victim's death, is overwhelming even without considering the cumulative evidence retrieved from defendant's computer pursuant to the third warrant.

Because the evidence of defendant's guilt and possible motives is overwhelming, the admission of evidence seized pursuant to the third warrant was harmless beyond a reasonable doubt and "the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).

## II. The Admission of Evidence Concerning the Death of Elizabeth Ratliff

[2] Defendant asserts that the trial court committed prejudicial error in admitting, over his objection, evidence concerning the death of Elizabeth Ratliff in the Federal Republic of Germany in 1985, in violation of Rules 401, 402, 403, and 404 of the North Carolina Rules of Evidence. The trial court, after having evidence presented to it outside the presence of the jury, made the following findings of fact in ruling upon defendant's motion *in limine* seeking exclusion of this evidence:

1. The Defendant was present and represented by his counsels of record, David Rudolf and Thomas Maher. The State of North Carolina was represented by District Attorney James Hardin, Jr. and Assistant District Attorneys Freda Black and David Saacks.

2. A voir dire hearing was held outside the presence of the jury on August 18, 2003 and August 20-22, 2003. Live testimony was given by Cheryl Appel-Schumacher, a friend of Elizabeth Ratliff, Margaret Blair, a sister of Elizabeth Ratliff, and Dr. Deborah Radisch, a forensic pathologist with the North Carolina Office of the Chief Medical Examiner. The Court also received into evidence several photographs, documents, and a written proffer regarding the testimony of Margaret Blair.

3. Elizabeth Ratliff was a close friend and neighbor of the Defendant and his former wife, Patricia Peterson, when they

lived in Germany in 1985. She had two young daughters named Margaret and Martha. Her husband, George Ratliff, was in the U.S. Air Force and he had passed away while away on assignment in October, 1983.

4. On the morning of November 25, 1985, Elizabeth Ratliff was found dead on the floor at the bottom of her open stairway in her home in Germany. The Defendant was summoned to the scene as were several other friends and associates.

5. The Defendant was with Ms. Ratliff the night before for dinner, and went back with her to her house to help with the children and a household chore.

6. Ms. Ratliff was found wearing her yellow plastic type boots that she would normally wear outdoors. It had snowed in that location two days before.

7. A large amount of blood was present at the scene, including bloodstains on the wall next to the stairway from the top of the stairs to the bottom, and underneath as well. The bloodstains at the top of the stairs contained smaller drops and appeared as if flicked on the wall by a small paintbrush. Bloodstains were also present on the wall opposite the staircase in the foyer area and on a refrigerator in the nearby kitchen. A pool of blood was found on the floor where Ms. Ratliff was found.

8. The Defendant dealt with the German authorities who responded that morning, and later handled the relations with the American military investigators who came to the scene. He also informed the friends and associates that Ms. Ratliff had died from a fall down the stairs.

9. An autopsy performed in Germany at a U.S. Army hospital, with a later review by the Armed Forces Institute of Pathology, determined that Ms. Ratliff died naturally of spontaneous intracranial bleeding and her physical trauma injuries were secondary due to her fall down the stairs.

10. Ms. Ratliff was exhumed in April, 2003 and brought to North Carolina's Office of the Chief Medical Examiner for a subsequent forensic autopsy, which determined her death to be a homicide. During that autopsy, Dr. Radisch found seven severe lacerations to the scalp of Ms. Ratliff, with a linear

skull fracture underneath one of the lacerations. Evidence of other intracranial bleeding was present as well.

11. Pursuant to the Last Will and Testament of Elizabeth Ratliff, Defendant and his former wife became the guardians of Ms. Ratliff's children, Margaret and Martha, and received certain household goods from her estate. The Defendant also received the benefits payments from the government to the children on their behalf.

12. Several similarities exist between the death of Elizabeth Ratliff in Germany in 1985 and the subject of this trial, which is the death of Kathleen Peterson in Durham, North Carolina in 2001. These similarities include:

   a. The deceased being found at the bottom of a stairway.

   b. No eyewitnesses to either alleged fall down the stairs.

   c. A large amount of blood present.

   d. Blood spatter present high and dried on the wall next to the stairway, including a bloodstain with small drops.

   e. No evidence of any forced entry or exit, or of any property being stolen.

   f. No murder weapon being recovered.

   g. The general time of day (late night to early morning) and general period of the calendar (late November to early December).

   h. Both deceased persons were females in their 40's who had a close personal relationship with the Defendant.

   i. Both deceased persons were similar in physical characteristics so that they looked alike and reported of severe headaches in the weeks before their death.

   j. Both deceased persons were planning to go on a trip in the near future and had dinner with the Defendant on the night before their death.

   k. Both deceased persons were later determined to have died from blunt force trauma to the head, including the same number of scalp lacerations and same general location of scalp wounds.

l. Both deceased persons had what could be characterized as defensive wounds on their bodies.

m. The manner of death for both deceased persons was later determined to be homicide.

n. The Defendant was the last known person to see both of these persons alive.

o. By being summoned to the scene in Germany and living at the scene in Durham, the Defendant is then present on the scene when the authorities arrive and reports that the death is the result of an accidental fall down the stairs.

p. The Defendant is in charge of the remains, effects, and household after each death, and is potentially in charge of each estate after death.

q. The Defendant received money or other items of value after each death.

Because these findings of fact by the trial court are supported by competent evidence found in the record, we consider them conclusive on appeal. *See State v. Cummings*, 361 N.C. 438, 471-72, 648 S.E.2d 788, 808 (2007) (citing *State v. Wiggins*, 334 N.C. 18, 38, 431 S.E.2d 755, 767 (1993)). Based upon these findings of fact, the trial court found the evidence regarding the Ratliff death to be relevant as to intent, knowledge, and absence of accident. Additionally, the trial court found that "[s]ubstantial evidence in the form of sufficient similar facts and circumstances exists between the two deaths so that a jury could reasonably find that the Defendant committed both acts," that the remoteness in time between the two deaths did not diminish its admissibility, that the evidence was admissible under Rules 402 and 404(b) of the Rules of Evidence, and that "[t]he probative value of this evidence outweighs any prejudicial effect on the Defendant."

Defendant asserts that the trial court erred in admitting this evidence because there was no evidence which tended to show that defendant was responsible for the death of Elizabeth Ratliff. In *State v. Jeter*, this Court stated:

[Rule 404(b)] includes no requisite that the evidence tending to prove defendant's identity as the perpetrator of another crime be direct evidence, exclusively. Neither the rule nor its application indicates that examples of other provisions—such as admissibility of evidence of other offenses to prove motive, opportunity,

intent, preparation, or plan—rest solely upon direct evidence. Under the statutory scheme of Rules 403 and 404, the concern that anything other than direct evidence of a defendant's identity in a similar offense might "mislead [the jury] and raise a legally spurious presumption of guilt" is met instead by the balancing test required by Rule 403: the critical inquiry regarding evidence of other offenses introduced for purposes of showing defendant's identity as the perpetrator of the offense for which he is being tried is not whether it is direct or circumstantial, but whether its tendency to prove identity in the charged offense substantially outweighs any tendency unfairly to prejudice the defendant.

326 N.C. 457, 459, 389 S.E.2d 805, 806-07 (1990) (alteration in original) (internal citation omitted). Thus, the prosecution was not required to present to the trial court direct evidence of defendant's involvement in the death of Elizabeth Ratliff, but could present circumstantial evidence which tends "to support a *reasonable* inference that the same person committed both the earlier and later acts." *State v. Stager*, 329 N.C. 278, 304, 406 S.E.2d 876, 891 (1991). In other words,

evidence is admissible under Rule 404(b) of the North Carolina Rules of Evidence if it is substantial evidence tending to support a reasonable finding *by the jury* that the defendant committed a similar act or crime and its probative value is not limited *solely* to tending to establish the defendant's propensity to commit a crime such as the crime charged.

*Id.* at 303-04, 406 S.E.2d at 890 (citations omitted). The trial court's findings of fact indicate not only significant similarities between the deaths of the victim and Elizabeth Ratliff, but also indicate sufficient circumstantial evidence that defendant was involved in Ratliff's death—such as defendant being the last known person to see Ratliff alive; defendant being with Ratliff the night of her death; and there being no sign of forced entry and nothing missing from the residence, which indicated that Ratliff likely knew her assailant.

This case is significantly similar to *State v. Stager*, in which the defendant was on trial for the first-degree murder of her second husband. *Id.* at 285, 406 S.E.2d at 879-80. The defendant told emergency responders that she accidently shot her second husband while she was removing a pistol from underneath a pillow. *Id.* at 286, 406 S.E.2d at 880. During their investigation of the death of defendant's second husband, investigators became aware that defendant's first husband

died from a gunshot wound ten years earlier. *Id.* at 291-92, 406 S.E.2d at 883-84. The trial court determined that there were substantial similarities between the two deaths and found as a matter of law that the circumstances surrounding the death of the first husband were admissible "as evidence of intent, plan, preparation, or absence of accident." *Id.* at 303, 406 S.E.2d at 890. This Court rejected the defendant's arguments that the evidence was irrelevant to prove intent or absence of accident. *Id.* at 304, 406 S.E.2d at 891. This Court noted eight similarities in *Stager*:

> (1) each of the defendant's husbands had died as a result of a single gunshot wound, (2) the weapon in each case was a .25 caliber semi-automatic handgun, (3) both weapons were purchased for the defendant's protection, (4) both men were shot in the early morning hours, (5) the defendant discovered both victims after their respective shootings, (6) the defendant was the last person in the immediate company of both victims, (7) both victims died in the bed that they shared with the defendant, and (8) the defendant benefited from life insurance proceeds resulting from both deaths.

*Id.* at 305-06, 406 S.E.2d at 892. Additionally, this Court rejected the defendant's argument that the temporal proximity of the two deaths weighed against admission of the evidence, stating "remoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility." *Id.* at 307, 406 S.E.2d at 893.

The similarities in the case *sub judice* are also striking. The trial court considered all of the evidence and found seventeen similarities between the deaths of Elizabeth Ratliff and the victim. Moreover, remoteness in time between the two deaths could affect the weight the jury might give to the evidence, but did not affect its admissibility. *See id.*

We review the trial court's decision to admit the evidence pursuant to Rule 403 for an abuse of discretion. *State v. Al-Bayyinah*, 359 N.C. 741, 747-48, 616 S.E.2d 500, 506-07 (2005) ("Whether to exclude evidence is a decision within the trial court's discretion."), *cert. denied*, 547 U.S. 1076 (2006). An " '[a]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Elliott*, 360 N.C. 400, 419, 628 S.E.2d 735, 748 (quoting

*State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)), *cert. denied*, —— U.S. ——, 127 S. Ct. 505, 166 L. Ed. 2d 378 (2006). "In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record." *State v. Lasiter*, 361 N.C. 299, 302, 643 S.E.2d 909, 911 (2007) (citing *Wainwright v. Witt*, 469 U.S. 412, 434 (1985)). The trial court did not act outside the bounds of reason in determining that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. We accordingly hold the trial court did not err in admitting evidence concerning the death of Elizabeth Ratliff.

### III. The Prosecution's Closing Arguments

[3] Defendant asserts that the trial court erred in overruling his objections to certain portions of the prosecution's closing arguments. In determining possible prejudice arising from improper arguments, we consider an allegedly improper statement in its broader context, as "particular prosecutorial arguments are not viewed in an isolated vacuum." *State v. Moseley*, 338 N.C. 1, 50, 449 S.E.2d 412, 442 (1994), *cert. denied*, 514 U.S. 1091 (1995). The following exchange took place during the closing argument of Assistant District Attorney Black:

> [Ms. BLACK:] Agent Deaver, Doctor Radisch, and Doctor Butts. You know what? They're state employees. Just like most of us that work here in the courthouse. And they work for your state. They work for your state, North Carolina.
>
> MR. MAHER [Defense Counsel]: Objection.
>
> THE COURT: Overruled.
>
> MS. BLACK: Not Chicago, Illinois. Not Connecticut. They work for us. They gave you truthful and accurate information. And you know what? They didn't get paid not one penny extra to come in here. Deaver should have, my goodness what he had to go through on the witness stand, but, no, he didn't get an extra penny.
>
> They might not have written books that they're signing and autographing for everybody. They might not travel to all of the rest of the states and give seminars and lectures. They're not allowed to, actually. It's not that they're not good enough to, it's they're not allowed to. They might not have appeared on Larry King Live or Court TV. But you know what? They are tried and true. Tried and true. Because they work for us.

STATE v. PETERSON

[361 N.C. 587 (2007)]

MR. MAHER:  Objection.

Ms. BLACK:  For our state.

THE COURT:  Approach the bench.

(The following bench conference was held on the record:)

MR. MAHER:  I'm objecting because the suggestion that these witnesses work for us, including the jurors, is improper. They're not special employees that came in for these jurors, and the suggestion that somehow because they work for us that they are more believable I think is improper, and that's why I'm objecting.

THE COURT:  Ms. Black.

Ms. BLACK:  They do.

MR. MAHER:  They don't work for the jurors.

Ms. BLACK:  They work for the State of North Carolina and the jurors live in the State of North Carolina.

MR. MAHER:  That is exactly the point, is that it's improper to suggest that because these jurors live in North Carolina, that employees—or they have no control over—are somehow more credible, and I'm objecting.

Ms. BLACK:  That's all I'm going to say about it.

MR. MAHER:  That's the basis for our objection.

THE COURT:  It's overruled in the Court's discretion.

(Conclusion of bench conference.)

THE COURT:  All right. Objection is overruled.

Ms. BLACK:  Now what further distinctions can be drawn about the experts? Well, one thing about Radisch, Deaver and Butts is they have been in this very courtroom before. They have. They've testified in front of people just like you. Durham County juries.

Lee, Leestma, Bandak, Palmbach, they've never been to Durham, as far as I know, in this courthouse before to testify, and they'll probably maybe never come back here again.

But after the tents and the vans are removed from outside of the courthouse, after all of the reporters and the cameras are

**STATE v. PETERSON**

[361 N.C. 587 (2007)]

gone, after all these cords and tape and everything are taken up from the floor, after we put—get the box down, after the microphones are all removed, Court TV goes to cover another case, after we get our courthouse back to normal, Deaver, Radisch, and Butts will be back in this courtroom again. They will. There will be other cases. Other murder cases. They'll be in that very witness stand again. Because that's what they do for a living. That's their livelihood. That's how they pay their bills.

MR. MAHER: Objection.

THE COURT: Overruled.

MS. BLACK: Doing the jobs that they do. And because they have to go face Durham County juries again, they only face juries from Murphy to Manteo, why in the world would they stake their reputation, their integrity, why would they stick their necks out to ruin their reliability when they know they've got to face people like you again? The answer to that question is they wouldn't. They wouldn't. They wouldn't come in here and give you inaccurate information. They're not going to do that.

MR. MAHER: Objection.

THE COURT: Approach the bench, please.

(The following bench conference was held on the record:)

MR. RUDOLF: I just want to put on the record that I've now heard at least ten times when Ms. Black has vouched for the credibility of a witness. I believe that's reversible error. I think the Court ought to be admonishing the jury that no lawyer ought to be vouching for the credibility of any witness or for their own credibility.

She's vouched for her own credibility, she's vouched for credibility of a witness. I think that's reversible error. Just for the record, I'm asking for a mistrial.

I know the Court is going to deny that, and I'd ask the Court to admonish the jury that Ms. Black ought not be vouching for anybody. Credibility of a witness is for them to decide, not Ms. Black to vouch for.

THE COURT: Well, I think that there were a couple of instances where you gave the Court the impression that you were—your personal opinion. For instance, you said I don't think

they would do that, meaning they would come in and give improper testimony.

Ms. BLACK: I didn't use the words, "I don't."

THE COURT: Yeah, I think you did.

But anyway, at this point, the motion for a mistrial in the Court's discretion is denied. I'm not really sure about the "us" and the "them," about they're coming down here, and they're your witnesses, they work for your state. I think that's a close issue. So I think you better be careful about that. I will instruct the jury that the personal opinion of counsel is not allowed.

MR. RUDOLF: Thank you.

THE COURT: Anything else?

MR. HARDIN: No, sir.

Ms. BLACK: No, sir.

(Conclusion of bench conference.)

THE COURT: Members of the jury, at several points counsel has indicated to the jury what the Court considers to be her personal opinions. Personal opinions about the credibility of witnesses or about anything else is not allowed by counsel and you ought to disregard that. The credibility of witnesses will be for the jury. Counsel can make arguments as to why she believes you should accept her position, but her personal opinions, such as "I believe," [are] not allowed by counsel.

"In a hotly contested trial . . . '[t]he scope of jury arguments is left largely to the control and discretion of the trial court, and trial counsel will be granted wide latitude.'" *State v. Allen*, 360 N.C. 297, 306, 626 S.E.2d 271, 280 (quoting *State v. Call*, 349 N.C. 382, 419, 508 S.E.2d 496, 519 (1998) (alteration in original)), *cert. denied*, —— U.S. ——, 127 S. Ct. 164, 166 L. Ed. 2d 116 (2006). In cases in which counsel makes a contemporaneous objection to opposing counsel's argument, this Court reviews the decision of the trial court for abuse of discretion. *See State v. Jones*, 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002). "In order to assess whether a trial court has abused its discretion when deciding a particular matter, this Court must determine if the ruling 'could not have been the result of a reasoned decision.'" *Id.* (quoting *State v. Burrus*, 344 N.C. 79, 90, 472 S.E.2d 867, 875 (1996)). This Court has articulated a two-part analysis for determin-

ing whether the trial court abused its discretion in such cases. "[T]his Court first determines if the remarks were improper . . . . Next, we determine if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court." *Id.* (citing *Coble v. Coble*, 79 N.C. 439, 79 N.C. 589 (1878)).

In applying this analysis to the case at bar, we note that the State has conceded that Assistant District Attorney Black's arguments were both "excessive and inappropriate." We will thus assume the statements at issue made by Assistant District Attorney Black to the jury were outside the parameters of acceptable argument and therefore improper. Because we assume the argument was improper, we must determine whether the argument prejudiced defendant to the degree that he is entitled to a new trial.

"[F]or an inappropriate prosecutorial comment to justify a new trial, it 'must be sufficiently grave that it is prejudicial [error].' " *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487-88 (1992) (quoting *State v. Britt*, 291 N.C. 528, 537, 231 S.E.2d 644, 651 (1977) (alteration in original)). "In order to reach the level of 'prejudicial error' in this regard, it now is well established that the prosecutor's comments must have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *State v. Green*, 336 N.C. 142, 186, 443 S.E.2d 14, 40 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974))), *cert. denied*, 513 U.S. 1046 (1994). However, this Court has held that when the trial court instructs the jury to disregard improper arguments and instructs counsel to confine his arguments to those matters contained in evidence, such an instruction renders the error caused by the improper arguments cured. *See State v. Sanders*, 303 N.C. 608, 618, 281 S.E.2d 7, 13, *cert. denied*, 454 U.S. 973 (1981).

Defendant argues that the trial court's curative instruction did not pertain to the portion of the closing argument in which Ms. Black advised the jurors to believe the prosecution's expert witnesses because they "work for us." Additionally, defendant contends that this statement amounts to prejudicial error that warrants a new trial. The State argues that the trial court's instruction did include the statements about which defendant complains and, even in the absence of the curative instruction, the statements did not rise to the level of prejudicial error. We agree with defendant that the curative instruction did not relate to the statements made concerning the State's experts "working for" the jury, but we agree with the State

that any prejudice arising from these statements did not " 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.' " *Green*, 336 N.C. at 186, 443 S.E.2d at 39 (citations omitted).

Defense counsel objected three times concerning Ms. Black's argument that the prosecution's expert witnesses should be considered credible because they were State employees. All three of those objections were overruled by the trial court. It was not until Ms. Black stated "They wouldn't come in here and give you inaccurate information. They're not going to do that," and defendant objected a fourth time, that the trial court determined it should instruct the jury to disregard the personal opinions of counsel. Although the trial court expressed some concern over the statements by Ms. Black encouraging the jury to consider that the experts were State employees, the trial court only instructed the jury: "Personal opinions about the credibility of witnesses or about anything else is not allowed by counsel and you ought to disregard that." The State's argument here does not take into account the sequence of events in which the trial court overruled defendant's objections as to the "they work for us" statements, but instructed the jury to disregard the statements of personal opinion such as: "They wouldn't come in here and give you inaccurate information. They're not going to do that." Accordingly, the trial court's instruction did not cure the error which arose from Ms. Black's statements that the prosecution's experts were to be believed because they worked for the State of North Carolina.

However, we cannot say that the statements made by Ms. Black rise to the level of reversible error. Defendant cites the cases of *State v. Allen*, 353 N.C. 504, 546 S.E.2d 372 (2001) and *State v. Jones*, 355 N.C. 117, 558 S.E.2d 97 (2002), in support of his position. We determine that these cases are significantly distinguishable so as to warrant a different result.

In *State v. Allen*, this Court reversed the defendant's convictions because the prosecutor advised the jury that the trial court had "found" certain hearsay statements to be "trustworthy and reliable." 353 N.C. at 509, 546 S.E.2d at 375. We noted that "[t]his argument clearly conveyed an opinion as to the credibility of evidence that was before the jury. This opinion was attributed directly to the trial judge in his presence, and he then overruled defendant's objection to this revelation." *Id.* The statement was not improper because it gave the opinion of the prosecutor, but because it improperly stated a "legal opinion of the trial court on the admissibility and credibility of evi-

dence, an opinion which was specifically outside the record." *Id.* at 510, 546 S.E.2d at 376. In the case *sub judice*, there is no support to be found in the record for the contention that Ms. Black was asserting that the trial court in some way endorsed the testimony of the prosecution's witnesses.

This case is also significantly different from *State v. Jones*. In *Jones*, this Court found it was improper for the prosecutor to invoke the Columbine school shootings and the Oklahoma City bombing as examples of tragedies that were analogous to the tragedy of the victim's death. 355 N.C. at 132, 558 S.E.2d at 107. These statements could not "be construed as anything but a thinly veiled attempt to appeal to the jury's emotions by comparing defendant's crime with two of the most heinous violent criminal acts of the recent past." *Id.* Additionally, this Court found it prejudicial when the prosecutor engaged in unnecessary name-calling. The prosecutor stated, "You got this quitter, this loser, this worthless piece of—who's mean . . . . He's as mean as they come. He's lower than the dirt on a snake's belly." 355 N.C. at 133, 558 S.E.2d at 107. There is absolutely no indication in the record that Ms. Black engaged in any name-calling or appealed to the raw emotions of the jurors.

This trial spanned five months, and the record contains thousands of pages of transcripts. The offending statements by Ms. Black spanned less than five minutes. We conclude that defendant has not met his burden of showing, in the totality of the trial and closing arguments, that the jury would have reached a different result had the trial court sustained defendant's objection or instructed the jury in a broader manner so as to preclude consideration of the improper argument. Because this burden has not been met pursuant to N.C.G.S. § 15A-1443(a), we hold that the statements made by Ms. Black were not so egregious as to require a new trial. *See State v. Rosier,* 322 N.C. 826, 829, 370 S.E.2d 359, 361 (1988).

## CONCLUSION

Because we hold that admission of the evidence seized pursuant to the third search warrant was harmless beyond a reasonable doubt, that the trial court did not err in admitting evidence concerning the death of Elizabeth Ratliff, and that the prosecutor's closing arguments did not amount to reversible error, we affirm the decision of the Court of Appeals.

AFFIRMED.