STATE OF NORTH CAROLINA v. JEREMY DUSHANE MURRELL

No. 484A06

(Filed 27 August 2008)

## 1. Confessions and Incriminating Statements— waiver of rights after appointment of counsel—knowing and voluntary—knowledge of indigent services rules not required

The trial court did not err in a first-degree murder prosecution by concluding that defendant's waiver of his rights was knowing and voluntary and that his statement to investigators was admissible. Counsel had been appointed but defendant waived his rights and elected not to have counsel present when making his statement to investigators after initiating contact. Whether defendant was advised of the provisions of IDS (indigent services) rules about the appointment of counsel in capital cases is immaterial to a determination under Miranda.

## 2. Jury— voir dire—prosecutor's remarks—definition of mitigating circumstance—shorthand summary

The prosecutor's remarks during voir dire in a first-degree murder prosecution that "A mitigating circumstance, if you choose to believe it, could make this crime more deserving of life imprisonment," were substantially correct shorthand summaries of the definition of mitigating circumstances and thus were not grossly improper.

## 3. Jury— selection—ability to impose death penalty

There was no plain error in a first-degree murder prosecution where the prosecutor was allowed to ask whether prospective jurors had the "intestinal fortitude" to vote for a death sentence. The question was not posed in a way that might affect the jurors' impartiality, and it is evident that the intent was to elicit answers which would have provided grounds for a challenge for cause.

## 4. Sentencing— capital—prosecutor's closing argument—mitigating circumstances

There was no plain error in a first-degree murder prosecution where defendant contended that the prosecutor misrepresented the law regarding mitigating circumstances by suggesting that mitigating evidence would have to lessen the severity of the crime. The remarks were at least substantially correct, and cannot then be said to be grossly improper.

STATE v. MURRELL

[362 N.C. 375 (2008)]

### 5. Criminal Law— prosecutor's closing argument—witness not called

The court did not abuse its discretion in a first-degree murder prosecution by overruling defendant's objection to the prosecutor's closing argument regarding a witness whom the State did not call. Defendant did not demonstrate prejudice because the only aspect of the witness's testimony possibly suggested by the State's argument was the assessment that defendant was not schizophrenic, with which defendant's own expert agreed.

### 6. Sentencing— prosecutor's closing argument—ability to vote for death penalty

There was no gross impropriety in a first-degree murder prosecution in the trial court not intervening ex mero motu in the prosecutor's arguments about having the inner strength to carry out justice and having the intestinal fortitude to vote for the death penalty.

### 7. Sentencing— capital—prosecutor's argument—use of mitigating evidence

The trial court did not abuse its discretion in a first-degree murder prosecution by overruling defendant's objection to the prosecution's alleged argument that the jury should consider mitigation evidence in support of an aggravating circumstance. In context, the argument was that defendant's childhood temper tantrums should not be significant factors in the consideration of defendant's mitigating evidence.

### 8. Sentencing— capital—prosecution's closing argument—contention for State's position rather than personal opinion

There was no gross impropriety in a first-degree murder prosecution where the prosecutors argued that they wanted the jury to return a recommendation of death. They were advocating the State's position rather than expressing a personal opinion.

### 9. Sentencing— capital—mitigating circumstances—definition

There was no error, plain or otherwise, in the court's definition of mitigating circumstances in the sentencing phase of a first-degree murder prosecution.

STATE v. MURRELL

[362 N.C. 375 (2008)]

## 10. Constitutional Law— effective assistance of counsel— questions to jurors about sympathy for defendant—no objection

There was no ineffective assistance of counsel in a first-degree murder prosecution where defendant contended that his trial counsel was ineffective in not objecting to questions concerning prospective jurors' sympathy for defendant because of his age. It would have been reasonable for trial counsel to interpret the questions as permissible inquiries into potential bias, and counsel sufficiently advocated the age of defendant as a mitigator.

## 11. Sentencing— capital—aggravating circumstances—pecuniary gain—causal connection—instructions

The trial court's instructions on the pecuniary gain aggravating circumstance in a capital sentencing proceeding sufficiently informed the jury regarding the circumstances which would support a finding of some causal connection between the murder and the pecuniary gain at the time the killing occurred when the court instructed that the pecuniary gain must have been "[obtained] as compensation for committing [the murder]" or "[intended or expected] as a result of the death of the victim."

## 12. Criminal Law— motion for appropriate relief—issues adequately raised

Under these particular circumstances, a defendant adequately raised on appeal each of the grounds underlying a motion for appropriate relief. Defendant filed his brief after filing his motion for appropriate relief and incorporated by reference into the brief each of the grounds for relief from the motion, and was evidently acting upon a good faith misunderstanding of the law.

## 13. Criminal Law— perjured testimony—prior convictions— not knowingly allowed

There was no error, and no prejudice even assuming error, where the defendant in a first-degree murder prosecution alleged that a witness was allowed to perjure himself concerning prior convictions, current charges, and discussions with a district attorney's office. The testimony about pending charges was true at that time, and defendant presented no evidence to support the assertion that the prosecution knowingly and intentionally allowed false testimony.

**14. Constitutional Law— effective assistance of counsel— cross-examination of State's witness**

A first-degree murder defendant was not denied the effective assistance of counsel in the cross-examination of a State's witness.

**15. Constitutional Law— effective assistance of counsel—conflict of interest**

A first-degree murder defendant received effective assistance of counsel where one of his attorneys had represented a State's witness previously, but the transcript revealed that the attorney did not remember the witness or her representation of him, nor did she discuss defendant's case with the witness. Defendant did not object at trial, or show that the potential conflict affected his lawyer's performance.

**16. Criminal Law— inconsistent statements by State's witness—not the knowing presentation of false testimony**

False testimony was not permitted from a witness for the prosecution where the witness made inconsistent statements. Issues of fact are of the jury to resolve.

**17. Constitutional Law— effective assistance of counsel— cross-examination and request for instructions**

A first-degree murder defendant was not denied the effective assistance of counsel in the cross examination of a State's witness and in the lack of a request for an instruction on accomplice testimony. Counsel's performance met the constitutionally required objective standard of reasonableness, and evidence of being an accessory after the fact does not subject the witness's testimony to rules regarding accomplice testimony.

**18. Criminal Law— prosecutor's closing argument—not prejudicial**

A first-degree murder defendant could not show that the failure to sustain his objection to the prosecutor's closing argument was prejudicial, even assuming the argument was improper. The argument concerned defendant ignoring the ringing of the victim's cell phone after the crime as the victim's family tried to find him; the challenged remarks were made to show the family's love of the victim.

**19. Criminal Law— keeping facts from jury—corrected on cross-examination—not prejudicial**

There was no prejudice in a first-degree murder prosecution where defendant argued that the prosecution had tried to keep from the jury the victim's attempt to buy marijuana. The jury heard the evidence through cross-examination of a detective.

**20. Criminal Law— questions assuming facts not in evidence— objections sustained—not prejudicial**

There was no prejudice in a first-degree murder prosecution where defendant asserted that the prosecution had asked questions assuming facts not in evidence, but defendant's objections had been sustained.

**21. Sentencing— death penalty—not disproportionate**

A death sentence was not disproportionate where the evidence supported the aggravating circumstances, there was no indication that the verdict was rendered under the influence of passion or any other arbitrary factor, and the sentence was proportionate in light of the defendant and the crime.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered on 17 February 2006 by Judge William Z. Wood, Jr. in Superior Court, Forsyth County, following a jury verdict finding defendant guilty of first-degree murder. On 26 March 2007, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. On 21 September 2007, defendant filed a motion for appropriate relief with the Supreme Court. Heard in the Supreme Court 6 May 2008.

*Roy Cooper, Attorney General, by Amy C. Kunstling, Assistant Attorney General, for the State.*

*Staples S. Hughes, Appellate Defender, by Benjamin Dowling-Sendor, Assistant Appellate Defender; and Paul M. Green for defendant-appellant.*

BRADY, Justice.

Late in the evening on 21 August 2003, defendant approached Lawrence Matthew Harding, who was seated in his own vehicle in a parking lot adjacent to his place of employment. Defendant fatally shot Harding twice in the head and neck with a firearm and, after transporting him to Durham in the vehicle, placed his body inside the

trunk and took from him a watch and approximately $130.00. Three days later, defendant abandoned the vehicle—along with Harding's body—near a bus station in Richmond, Virginia. The victim was not discovered until 29 August 2003, more than one week after the murder. Defendant was apprehended and subsequently convicted of first-degree murder, first-degree kidnapping, and robbery with a dangerous weapon and was sentenced to death for the murder. We find no error in defendant's convictions or sentences and deny defendant's contemporaneously filed Motion for Appropriate Relief.

## PROCEDURAL BACKGROUND

On 6 July 2004, the Grand Jury of Forsyth County returned true bills of indictment charging defendant with first-degree kidnapping, robbery with a dangerous weapon, and first-degree murder of Lawrence Matthew Harding. Defendant was tried capitally and, on 10 February 2006, was found guilty by a jury on all charges. With respect to the jury's verdict on the murder charge, the jury found defendant guilty of first-degree murder on the basis of both the theory of malice, premeditation, and deliberation and under the felony murder rule.

On 17 February 2006, following the statutorily required sentencing hearing, the jury returned a binding recommendation that defendant be sentenced to death for the first-degree murder conviction, and judgment was entered accordingly by the trial court. Defendant was also sentenced within the presumptive range for the robbery with a dangerous weapon and first-degree kidnapping convictions.

Defendant now appeals his first-degree murder conviction and sentence of death as of right pursuant to N.C.G.S. § 7A-27(a) and has asserted several assignments of error in a Motion for Appropriate Relief filed on 21 September 2007, during the pendency of his appeal. Defendant also moved to bypass the Court of Appeals in appealing his non-capital judgments, and this Court allowed the defendant's motion on 26 March 2007.

## FACTUAL BACKGROUND

### I. GUILT PHASE EVIDENCE

The State's evidence presented during the guilt phase of defendant's trial tended to show the following: That late in the evening on 21 August 2003, the victim, Matthew Harding, completed his regular food preparation shift at the restaurant where he was employed,

South by Southwest in Winston-Salem. He received a paycheck for $331.00, left the restaurant, and entered his red Mitsubishi Lancer automobile, which was parked in an adjacent lot. He was last observed by a fellow employee in the same parking lot at approximately 10:30 p.m., seated in his stationary vehicle with the interior light turned on and the stereo playing at a high volume.

A missing person report was filed with the Winston-Salem City Police Department on 22 August 2003 after the victim did not report for his scheduled shift at work and his father and stepmother were unable to contact him. Officer W.E. Kelsey, who took the report from the victim's parents, canvassed the restaurant's parking lot for evidence later the same day and retrieved a shell casing. On 29 August 2003, a red Mitsubishi Lancer with a North Carolina license plate number matching that of the victim's vehicle was discovered on Altamont Street in Richmond, Virginia, by the Richmond City Police Department.

The vehicle was seized and subsequently towed to the Virginia Medical Examiner's Office, where skeletal remains later identified as the victim's were discovered in the trunk. Investigators also recovered two projectile fragments from the floor of the rear passenger area of the vehicle and detected the presence of metal particles around a hole in the front passenger seat. An autopsy of the victim's remains conducted on 30 August 2003 revealed that he had suffered two gunshot wounds to the head and neck areas. The head wound would have been immediately incapacitating and fatal, whereas the wound traced from under the left side of his chin down through the soft tissue of his neck and into his spine might have been survivable but would have been painful and likely caused some paralysis; however, the autopsy did not reveal the order in which these wounds were inflicted.

One additional projectile was recovered during the autopsy. A ballistics expert tendered without objection from defendant testified that this projectile was consistent with a "caliber .380 auto full metal jacketed bullet" and that the shell casing retrieved by Officer Kelsey from the South by Southwest parking lot in Winston-Salem was a fired Winchester caliber .380 auto cartridge case.

The State also presented the testimonies of several acquaintances of defendant. Mangus Daniels, at whose apartment defendant resided during the summer of 2003, testified that before the night of 21 August 2003, defendant had occasionally mentioned the possibil-

ity of robbing someone to obtain money. Daniels further testified that on 21 August 2003 he received a telephone call from defendant, who indicated that he had robbed someone. After a few days, defendant returned to Daniels' apartment, at which point defendant described having forced someone into a trunk at gunpoint and taken the vehicle to Virginia. Defendant further described the victim as "a white guy" and stated that he left him in good health, although defendant had shot into the trunk of the vehicle to keep the victim from making too much noise. In October 2003, prompted by a Winston-Salem newspaper account of a body discovered in Virginia, Daniels first confronted defendant during a telephone conversation and then initiated contact with Crime Stoppers, the victim's family, and law enforcement concerning the murder.

Defendant also related to his girlfriend, Stacy Whitson, before 21 August 2003 that he wanted to rob someone for money. Defendant lived temporarily at Whitson's residence from 17 August 2003 until he was ultimately apprehended by law enforcement in October 2003. One day during October 2003, while at Whitson's residence, defendant returned a telephone call in response to a message he had received from Daniels. After speaking with Daniels, he said to Whitson, "I didn't want to get that phone call." Defendant then borrowed a vehicle belonging to Whitson's roommate in order to obtain a newspaper. Whitson later witnessed defendant balling up a newspaper and discarding it in the trash. Defendant also asked Whitson whether investigators could detect fingerprints on clothing.

Another of defendant's acquaintances, Bennie Cameron, testified that he was aware defendant possessed a firearm sometime before 21 August 2003 and that defendant had stated his intention to rob someone, put the individual in the trunk of his or her own vehicle, and take the vehicle to Durham. Defendant also indicated to Cameron that he knew of a "chop shop" in Durham.[1] In August 2003, defendant visited Cameron's apartment and indicated he had robbed someone and put the individual in the trunk. Defendant further indicated that he had obtained approximately $130.00 from the victim, whom he had transported to Virginia.

At about 11:00 p.m. on 21 August 2003, Alonzo Dingle, a friend of defendant who resided in Durham at the time, left work and returned to his apartment. Dingle heard a knock on the door as he was show-

---

1. "Chop shop" is defined as "a place where stolen automobiles are stripped of salable parts." *Merriam-Webster's Collegiate Dictionary* 202 (10th ed. 1993) [hereinafter *Merriam-Webster's*].

ering, and when he opened the door he observed defendant standing outside, smiling and wearing no shirt. According to testimony from Dingle, defendant requested his assistance in placing a dead body in the trunk of a vehicle. Defendant made several similar requests as he and Dingle spent some time inside the apartment, but Dingle did not believe defendant was serious.

Eventually, defendant convinced Dingle to follow him to the parking lot outside his apartment, where Dingle observed a white male inside a Mitsubishi Lancer with his head positioned on the floor of the front passenger area, one leg across the driver's seat and the other between the two front seats extending into the rear of the vehicle. Dingle testified that he observed no blood at this time and that he thought defendant and the other man were playing a joke on him.

Defendant subsequently drove the vehicle to a nearby neighborhood, with the victim's body situated in the same manner and Dingle seated in the rear. Defendant parked the vehicle on the street, moved around to the front passenger side, opened the door, and dragged the body out of the vehicle. At this point, Dingle observed the man's face was covered with blood and that he was not moving. Dingle then refused defendant's request for assistance and watched as defendant placed the body inside the trunk of the vehicle. When Dingle asked defendant what had happened, defendant explained that he needed to eat.

Additionally, the State introduced into evidence a recorded statement defendant made to law enforcement on 28 October 2003. Defendant's account of the events surrounding the victim's death on 21 August 2003 was as follows: He knew the victim, although not by name, from a previous encounter during which the victim had purchased marijuana from defendant. Sometime after 9:00 p.m. on 21 August 2003, while defendant was standing near an intersection in Winston-Salem, he was approached by the victim, who wished to again purchase marijuana, but defendant shook his head "no" to communicate that he did not have any marijuana at the time.

Defendant next saw the victim sometime later in the evening seated in his vehicle in a parking lot near a hotel and listening to music. By this time, defendant had obtained about an ounce of marijuana and was carrying in his right pants pocket a .380 caliber handgun, which he had borrowed from Dingle. Without speaking, defendant entered the vehicle through the front passenger side door to initiate the sale of marijuana to the victim in exchange for cash, in

similar fashion as the two had done previously. A struggle ensued, apparently initiated by the victim attempting to "snatch" the marijuana, during which defendant "panicked" and removed the handgun from his pocket with his right hand. The victim subsequently pulled at defendant's right hand, which caused the handgun to discharge once into the victim's face or head.[2]

Defendant repositioned the victim from the driver's seat to the front passenger seat of the vehicle, so that the victim was upside down with his head positioned near the floorboard. Defendant departed the scene operating the victim's vehicle, eventually merged onto Interstate 40, and drove east. He considered taking the victim to a hospital but, as he continued driving, the victim said to him, "Finish me off." As defendant described: "A few seconds later, he said, 'Please,' and he said, 'Please' again. And, he said, that's, that's when he got, got to me personally and that's when the . . . So, that's when it, cause he twitched and I shot him." After this second shot was fired, it appeared to defendant the victim was dead, and he noticed no further movement or other signs of life from the body.

According to defendant, he arrived at Dingle's apartment in Durham between 10:00 and 11:00 p.m. on 21 August 2003, with the victim's body situated in the same manner as before. When defendant explained to Dingle what had happened and requested his assistance, Dingle retrieved a pair of gloves and a hat. After some discussion, the two men decided to dispose of the body somewhere in Durham and traveled around town in the vehicle for thirty minutes to an hour with defendant operating the vehicle, the victim's body in the front passenger seat, and Dingle seated in the rear behind defendant. Ultimately, they decided to stop the vehicle and place the body inside the trunk, and Dingle assisted defendant in doing so.

After defendant and Dingle returned to the Durham apartment in the same vehicle, defendant showered and followed Dingle's advice to dispose of his own clothes and the victim's cellular phone, placing these items in trash bags and discarding them in the garbage dumpster outside of Dingle's apartment. Dingle also advised defendant to dispose of the vehicle, along with the victim's body, in some location outside of the state.

2. Before making a recorded statement, defendant provided law enforcement an inconsistent account of events in which he stated that a third, unidentified individual shot the victim in the face while defendant and the victim were both seated in the vehicle engaged in the drug transaction.

STATE v. MURRELL

[362 N.C. 375 (2008)]

Defendant departed Dingle's apartment and returned to the vehicle with the handgun, the victim's watch, and approximately $115.00 or $120.00 he had taken from the victim's wallet. He traveled north on an unspecified route until he reached Richmond, Virginia, in the early morning hours of 22 August 2003, at which point he decided he would dispose of the remaining evidence in that city. During the next three days, defendant drove the vehicle around the Richmond area and as far north as Washington, D.C., while the victim's body remained in the trunk. Defendant placed several calls from his cellular phone—to Whitson, Daniels, and his father—and at one point attended a screening of a horror film at an unspecified public movie theater. On 24 August 2003, defendant abandoned the vehicle, along with the body, in a secluded area near a bus station in Richmond. He discarded the keys to the vehicle, sold the .380 caliber handgun for $90.00, and used the proceeds to purchase a bus ticket to return to Winston-Salem. Once he arrived in Winston-Salem, defendant returned to Daniels' residence in a taxi.

Defendant did not introduce evidence during the guilt phase of his trial.

## II. PENALTY PROCEEDING EVIDENCE

The State introduced as victim impact evidence the testimony of Judy Harding, the victim's stepmother, who described how much he was missed by his family.

Defendant introduced as mitigating evidence the testimonies of defendant's family members, including his father and sister, detailing how defendant was adversely affected during childhood by his mother's paranoid schizophrenia and the mental problems his father suffered as a result of a head injury.

Claudia Reeves Coleman, Ph.D., a licensed clinical psychologist with a practice in Raleigh, was tendered by defendant without objection as an expert in forensic psychology. Dr. Coleman testified that she diagnosed defendant as having suffered from a mood disorder since childhood; that defendant was thus prone to panic and anxiety attacks, depression, and poor impulse control; and that he was at a higher than normal risk for developing a schizophrenic disorder as a consequence of his family's mental health history. Dr. Coleman's opinion was that, at the time of the murder, defendant was suffering from a significant mood disorder which impaired his capacity to conform his conduct to the law.

The jury found as aggravating circumstances that the murder was committed for pecuniary gain, that the murder was especially . heinous, atrocious, or cruel, that the murder was committed while defendant was engaged in the commission of robbery with a dangerous weapon, and that the murder was committed while defendant was engaged in the commission of first-degree kidnapping. One or more jurors found the statutory mitigating circumstances that defendant has no significant history of prior criminal activity and that the murder was committed while defendant was under a mental or emotional disturbance. Several nonstatutory mitigating circumstances were also found to exist by one or more jurors.

The jury unanimously found the mitigating circumstances insufficient to outweigh the aggravating circumstances, and further found that the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty when considered with the mitigating circumstances. Accordingly, the jury entered its binding recommendation that defendant be sentenced to death for the murder conviction.

## ANALYSIS

### I. PRETRIAL ISSUES

[1] Defendant assigns error to the trial court's 30 January 2006 order denying his pretrial motion to suppress evidence. Defendant moved before trial to suppress an inculpatory statement he made to law enforcement on 28 October 2003, following his arrest on 24 October 2003, on the basis that he did not knowingly and voluntarily waive his right to counsel before making this statement.

At the conclusion of the hearing on defendant's motion to suppress, the trial court made, *inter alia*, the following findings of fact: On 24 October 2003, defendant was questioned by police investigators for approximately three hours at the Winston-Salem City Police Department. Immediately after this interview, during which defendant "did not make any admissions of any type . . . in any way," defendant was arrested for first-degree kidnapping and robbery with a dangerous weapon of Matthew Harding, but was not charged with murder. Detective D.L. Elmes subsequently transported defendant to the Forsyth County jail and gave defendant his business card in case defendant wished to speak with him or "wanted to get anything off his chest."

STATE v. MURRELL

[362 N.C. 375 (2008)]

At approximately 8:00 a.m. on 28 October 2003, defendant initiated contact with investigators by placing a telephone call from the county jail to the number listed on Detective Elmes' business card and leaving a voice mail message requesting to meet with him. When the investigators arrived at the jail, they advised defendant of his *Miranda* rights. Defendant stated that he understood these rights and wanted to answer questions, indicated that he was aware he had already been appointed counsel, and responded that he did not wish to have an attorney present during questioning but instead chose to waive the appearance of his appointed counsel. Before making his statement, defendant told the investigators, "I want y'all to help me."

Based upon its findings of fact, the trial court concluded that defendant's statement to investigators "was made freely, voluntarily, and understandingly and . . . without promise of hope or reward . . . and without force or pressure." The court determined that the statement was admissible as a result.

Although defendant assigned error to the trial court's findings of fact, he has failed to make any argument on appeal that these findings were unsupported by competent evidence. Thus, we are bound by the trial court's findings of fact, and our review on appeal is limited to a determination of whether these findings support the lower court's conclusions of law. *See State v. Cheek,* 351 N.C. 48, 62-63, 520 S.E.2d 545, 554 (1999) (citing *State v. Watkins,* 337 N.C. 437, 438, 446 S.E.2d 67, 68 (1994)), *cert. denied,* 530 U.S. 1245 (2000).

Defendant asserts that his waiver of the right to have an attorney present during questioning was not knowing and voluntary because he "could not possibly waive a right that he did not know existed." However, defendant does not contend that investigators did not apprise him of his right to have an attorney present. Rather, he argues that certain steps should have been taken to notify the North Carolina Office of Indigent Defense Services (IDS) that defendant might potentially become a capital defendant. *See* N.C.G.S. §§ 7A-498.1 to -498.8 (2007) ("Indigent Defense Services Act"); Indigent Def. Servs. Rules, Subpart 2A ("Appointment and Compensation of Trial Counsel in Capital Cases"), *reprinted in* 2008 Ann. R. N.C. 974-79.[3] Yet the decision of the Supreme Court of the United States in *Miranda v. Arizona* expressly dispels any

---

3. We note that Part 2 of the IDS rules *"places with [IDS]* the responsibility for appointing and compensating counsel in capital cases." Indigent Def. Servs. Rules, Part 2, *reprinted in* 2008 Ann. R. N.C. 973 (emphasis added).

notion that the failure of investigators to *obtain* counsel for a defendant constitutes a violation of the Fifth Amendment right against self-incrimination:

> This does not mean, as some have suggested, that each police station must have a 'station house lawyer' present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person *they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation.*

384 U.S. 436, 474 (1966) (emphasis added). Whether defendant was advised of the provisions of the IDS rules pertaining to the appointment of counsel in capital cases is immaterial to a determination under *Miranda* of whether defendant was informed "that if he is indigent a lawyer will be appointed to represent him." *Id.* at 473; *see also Moran v. Burbine*, 475 U.S. 412, 422 (1986) ("Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.").

In this regard, the instant case is easily distinguishable from *State v. Steptoe*, in which the defendant clearly communicated his desire to have a lawyer and to speak with an attorney, and only *after* the investigators "discouraged the appointment of counsel" did the defendant issue a statement. 296 N.C. 711, 716-17, 252 S.E.2d 707, 710-11 (1979). Here, in contrast, defendant had already been appointed counsel but waived his *Miranda* rights and elected not to have counsel present when making his statement to investigators after initiating contact with them. The trial court did not err in concluding that defendant's waiver was knowing and voluntary and that his statement to investigators on 28 October 2003 was thus admissible. Defendant's assignments of error related to this issue are overruled.

## II. JURY SELECTION ISSUES

### A. *Prosecutor's Characterization of "Mitigating Circumstances"*

[2] Defendant contends that the trial court erred during jury selection by permitting the prosecutor, over defendant's objection, to misrepresent the law with regard to mitigating circumstances. Our trial courts have traditionally been afforded broad discretion to rule upon the manner and extent of jury voir dire, and this Court will not disturb such a ruling on appeal absent an abuse of that

discretion. *State v. Polke*, 361 N.C. 65, 68-69, 638 S.E.2d 189, 191 (2006) (citations omitted), *cert. denied*, —— U.S. ——, 128 S. Ct. 70, 169 L. Ed. 2d 55 (2007).

Before trial, defendant filed a written motion "To Prohibit the DA from Improperly Defining a Mitigating Circumstance." At a pretrial hearing on defendant's motion on 12 January 2006, the trial court reserved its ruling on the motion, instructing both sides to "follow the statute" and to note an objection in the event opposing counsel made "any improper statement of the law."

During the State's jury voir dire questioning on 30 January 2006, the prosecutor stated without objection: "A mitigating circumstance, if you cho[o]se to believe it, could make this crime more deserving of life imprisonment." However, defense counsel did object to two similar remarks made by the prosecutor later in the proceeding, and these objections were sustained.

On the morning of 31 January 2006, defendant filed a written motion to prohibit the prosecutor from "incorrectly defining aggravating and mitigating circumstances." The trial court held a brief hearing on defendant's motion and again declined to enter a ruling, but noted defendant's continuing objection "to [the prosecutor's] questions."

As in *State v. Frye*, the prosecutor's remarks during voir dire "were shorthand summaries of the definition[] of . . . mitigating circumstances" and "were substantially correct, even if slightly slanted toward the State's perspective." *See* 341 N.C. 470, 491, 461 S.E.2d 664, 674 (1995), *cert. denied*, 517 U.S. 1123 (1996). Thus, the trial court's rulings upon defendant's motions and objections were not "manifestly unsupported by reason or so arbitrary that they could not have been the result of a reasoned decision." *Polke*, 361 N.C. at 69, 638 S.E.2d at 191 (citations and internal quotation marks omitted). Defendant's assignment of error is overruled.

## B. The Prosecutor's Use of the Phrase "Intestinal Fortitude"

[3] Defendant also challenges on appeal a question asked individually of prospective jurors by the prosecutor at jury selection: Whether the individual possessed the "intestinal fortitude" to vote for a sentence of death. Defendant initially noted his objection to the prosecutor's use of this phrase and was overruled, but thereafter failed to preserve this assignment of error for appellate review

with further timely objection. Alternatively, defendant has asserted plain error.

Regardless of the applicable standard of review, we find no error related to this issue, plain or otherwise. Defendant attempts to distinguish this Court's previous decision in *State v. Oliver*, 309 N.C. 326, 307 S.E.2d 304 (1983). In *Oliver*, this Court found no error in the prosecutor's use of the words "backbone" and "intestinal fortitude," respectively, when questioning two prospective jurors "who equivocated on imposition of the death penalty" for the specific purpose of determining, "in light of their equivocation, whether they could comply with the law." *Id.* at 355, 307 S.E.2d at 323. The Court held that the defendants had failed to demonstrate prejudice since "these comments could be viewed as favorable, rather than unfavorable to defendants' position as they tended to encourage jurors who equivocated on imposition of the death penalty to serve." *Id.*

As stated in *Oliver*, we review prosecutorial remarks in light of both the context in which they were made and "the overall factual circumstances to which they referred." *Id.* (citation and internal quotation marks omitted). In this case, no less than in *Oliver*, the prosecutor's questions "were made not to badger or intimidate these [prospective jurors], but rather to determine . . . whether they could comply with the law." *Id.* It is evident from the transcript of jury selection proceedings that the prosecutor intended this question of "intestinal fortitude" to elicit from prospective jurors answers which would have provided grounds for a challenge for cause. *See* N.C.G.S. § 15A-1212(8), (9) (2007). In fact, the phrase "intestinal fortitude" was simply substituted when defendant's objection to the word "courage" was sustained.

Moreover, this Court has previously found no abuse of discretion or prejudicial error with respect to similar inquiries which have implicated a prospective juror's metaphorical physiological capacity to recommend a sentence of death when called upon to do so by law. *See, e.g., State v. Flippen*, 349 N.C. 264, 275, 506 S.E.2d 702, 709 (1998) (questions concerning "courage" of prospective jurors), *cert. denied*, 526 U.S. 1135 (1999); *State v. Smith*, 328 N.C. 99, 130, 400 S.E.2d 712, 729 (1991) (questions concerning whether prospective jurors were "strong enough"); *State v. Hinson*, 310 N.C. 245, 252, 311 S.E.2d 256, 261 (question concerning "backbone" of an equivocating prospective juror), *cert. denied*, 469 U.S. 839 (1984). Similarly, the prosecutor's question in the instant case was not posed to prospective jurors in a way that might affect their impartiality, and the trial

court therefore committed no prejudicial error in overruling defendant's objection.

Defendant also argues, without citing any authority, that his trial counsel were ineffective to the extent they failed to note a timely objection to the prosecutor's questions. As we have applied an abuse of discretion standard of review to defendant's argument and have found this argument to be without merit, we need not reach any ineffective assistance of counsel claims related to this issue as they have been rendered moot.

Accordingly, defendant's related assignments of error are overruled.

## III. PENALTY PROCEEDING ISSUES

### A. *Prosecution's Closing Argument*

[4] Defendant raises several issues by assignment of error and argument in his brief concerning the prosecution's closing argument at the penalty proceeding on 16 February 2006.

Defendant first contends that the prosecution misrepresented the law with regard to mitigating circumstances. The prosecutor suggested more than once during closing argument that mitigating evidence would have to "lessen the severity of this crime." However, defense counsel failed to object to any of these remarks at trial. Thus, we review the remarks for whether they "were so grossly improper that the trial court erred in failing to intervene *ex mero motu*." *State v. Barden*, 356 N.C. 316, 358, 572 S.E.2d 108, 135 (2002) (citing *State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998), *cert. denied*, 528 U.S. 835 (1999)), *cert. denied*, 538 U.S. 1040 (2003).

As with defendant's similar assignment of error concerning prosecutorial remarks made during jury selection, we find that the prosecutor's remarks at closing argument "were shorthand summaries of the definition[] of . . . mitigating circumstances" and "were substantially correct, even if slightly slanted toward the State's perspective." *Frye*, 341 N.C. at 491, 461 S.E.2d at 674. Because these remarks were at least "substantially correct," it does not stand to reason that they were in any way "grossly improper." *Id.* These assignments of error are overruled.

[5] Defendant next contends that the trial court erred in overruling his objection to the following portion of the prosecution's closing argument:

STATE v. MURRELL

[362 N.C. 375 (2008)]

You also saw Dr. [Steve] Kramer sitting in the front row, somebody on the State's witness list. Defense may make—make a comment about why didn't the State call Dr. Kramer? Well, what is the net effect of zero? Zero. The cumulative effect of zero is zero. You want more testimony to tell you that this defendant is not schizophrenic?[4]

We apply an abuse of discretion standard in reviewing the trial court's decision to overrule defendant's timely objection. *State v. Peterson,* 361 N.C. 587, 606, 652 S.E.2d 216, 229 (2007) (citing *State v. Jones,* 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002)), cert. denied, —— U.S. ——, 128 S. Ct. 1682, 170 L. Ed. 2d 377 (2008). Under this standard, we apply a two-part analysis: " '[T]his Court first determines if the remarks were improper . . . . Next, we determine if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court.' " *Id.* at 606-07, 652 S.E.2d at 229 (quoting *Jones,* 355 N.C. at 131, 558 S.E.2d at 106 (alterations in original)).

Defendant asserts that the jury was erroneously permitted to infer from the prosecutor's line of argument that Dr. Kramer's testimony would have been favorable to the State had he been called as a witness and qualified as a mental health expert. However, the only aspect of Dr. Kramer's potential testimony that was even conceivably suggested by the State's closing argument was an assessment, *with which defendant's own mental health expert witness concurred,* that defendant was not schizophrenic. Even assuming, *arguendo,* the impropriety of the prosecutor's reference to Dr. Kramer, defendant has failed to demonstrate prejudice.

Thus, we hold that the trial court did not abuse its discretion by overruling defendant's objection to these remarks. Accordingly, this assignment of error is overruled.

[6] Defendant next assigns error to the trial court's failure to intervene *ex mero motu* during the prosecution's closing argument when the prosecutor implored jurors to "find the inner strength to carry out justice." Since defendant failed to object to the prosecutor's remarks,

---

4. In his brief, defendant describes other instances in which the prosecutor made reference to Dr. Kramer, both during jury selection and during the penalty proceeding, and discusses at length the facts surrounding the prosecutor's decision not to call Dr. Kramer as a witness. However, defendant has not preserved any of these matters for appellate review either through assignment of error or by "specifically and distinctly" contending plain error. Thus, our consideration is limited to the objected-to portion of the prosecution's closing argument quoted above. *See* N.C. R. App. P. 10(c).

**STATE v. MURRELL**

[362 N.C. 375 (2008)]

we must determine whether these remarks were " 'so grossly improper that the trial court erred in failing to intervene *ex mero motu.*' " *State v. Walters,* 357 N.C. 68, 101, 588 S.E.2d 344, 364 (quoting *Barden,* 356 N.C. at 358, 572 S.E.2d at 135), *cert. denied,* 540 U.S. 971 (2003).

Defendant provides no authority or legal analysis to demonstrate that the language "find the inner strength to carry out justice" was in any way grossly improper. Defendant argues instead that the cumulative effect of the prosecutor's questions during jury selection concerning jurors' "intestinal fortitude" to vote for the death penalty and the prosecutor's repeated remarks at closing argument imploring jurors to "find the inner strength to carry out justice" was sufficiently prejudicial to warrant a new sentencing hearing. Relatedly, defendant asserts that the prosecutor's question during jury selection concerning whether prospective jurors possessed the "intestinal fortitude" to vote for the death penalty was recalled in the minds of the jurors at closing argument when the prosecutor stated, "We asked you in jury selection if you were strong enough to do this."

As set forth above, we can discern no prejudicial error in the trial court's decision to allow the prosecutor's inquiry into the "intestinal fortitude" of prospective jurors to vote for a sentence of death. Absent any further analysis from defendant specifically addressing the prosecutor's remarks at closing argument, we are unable to hold that these remarks rose to the level of gross impropriety. Moreover, defendant has not carried his burden under the *Strickland* test with regard to the ineffective assistance of counsel claims he sets forth related to this issue. *See Strickland v. Washington,* 466 U.S. 668, 687 (1984) (requiring a defendant to show both that trial counsel's performance was "deficient" *and* that the defendant was prejudiced as a result). Accordingly, defendant's assignments of error are overruled.

[7] Defendant contends that the following portion of the prosecution's closing argument prompted the jury to consider defendant's evidence in mitigation as evidence in support of an *aggravating* circumstance instead:

> Consider whether [defendant] has shown signs in his childhood of emotional disturbance as evidenced by prolonged crying spells or periods of staring at nothing or unwillingness to engage with other children or inability to tolerate being touched. He had temper tantrums when he was a toddler. He had a bad temper. He would throw fits when he didn't get what he wanted, I believe,

was the testimony. Perhaps his personality for murder was already formed.

The trial court overruled defense counsel's objection to this argument. Thus, we determine whether the trial court abused its discretion and therefore, whether its ruling "could not have been the result of a reasoned decision." *Peterson*, 361 N.C. at 606, 652 S.E.2d at 229 (citation and internal quotation marks omitted) (quoting *Jones*, 355 N.C. at 131, 558 S.E.2d at 106).

Specifically, defendant characterizes the statement, "Perhaps his personality for murder was already formed," as an invitation to jurors to vote for a sentence of death *because of* the mitigating evidence he presented at the penalty proceeding. However, it is well established that " 'statements contained in closing arguments to the jury are not to be placed in isolation or taken out of context on appeal.' " *See State v. Thompson*, 359 N.C. 77, 110, 604 S.E.2d 850, 873 (2004) (quoting *State v. Green*, 336 N.C. 142, 188, 443 S.E.2d 14, 41, *cert. denied*, 513 U.S. 1046 (1994)), *cert. denied*, 546 U.S. 830 (2005). The prosecutor's line of argument from which the challenged remarks have been extracted can be traced back for seven pages of transcript and continues on for approximately eleven pages—for a total of eighteen transcript pages. This line of argument served the prosecutor's purpose of calling into question the weight jurors ought to assign to each individual item of defendant's mitigating evidence. At one point, the prosecutor stated to the jury that defendant would "hurl grapes around the courtroom" in the form of mitigating circumstances "[a]nd even though there are 41 of them, when you put 41 grapes on a scale with four watermelons, we know that it's not going to weigh more than four watermelons."

Viewed in this context, it is readily apparent that the prosecutor was not in any way suggesting defendant had formed a "personality for murder" as a toddler, but rather was using a skeptical tone to advocate the opposite conclusion: That, in the prosecutor's view, defendant's early temper tantrums should not be significant factors in jurors' consideration of defendant's mitigating evidence.

For this reason, we hold that the trial court did not abuse its discretion in overruling defendant's objection to this argument; therefore, this assignment of error is overruled.

[8] Finally, defendant contends that prosecutors expressed their personal desires, opinions, or beliefs during closing argument when ad-

**STATE v. MURRELL**

[362 N.C. 375 (2008)]

vocating that the jury return a binding recommendation of death and that these remarks were grossly improper. Specifically, defendant assigns error to the following:

> [T]here are going to be four questions. I want you to answer yes, yes to every one of them, and then I want you to write—I want your foreperson to write on that last line death, because I want you to do justice, I want you to give a punishment that is appropriate for the crime.

Additionally, the prosecution encouraged the jury to "answer those questions yes, yes, yes, and yes. The recommendation in this case is death."

Because defendant did not object when these remarks were made, we review them for whether they were " 'so grossly improper that the trial court erred in failing to intervene *ex mero motu.*' " *Walters*, 357 N.C. at 101, 588 S.E.2d at 364 (quoting *Barden*, 356 N.C. at 358, 572 S.E.2d at 135). Defendant cites this Court's decision in *Jones* to support his assertion that the prosecutor's argument was grossly improper. *See* 355 N.C. at 135, 558 S.E.2d at 108 (stating that closing argument must be "devoid of counsel's personal opinion"); *see also* N.C.G.S. § 15A-1230(a) (2007) (stating that during closing argument to the jury "an attorney may not . . . express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant"); N.C. St. B. R. Prof. Conduct 3.4(e), 2008 Ann. R. N.C. 759, 848-49 (stating that "[a] lawyer shall not . . . in trial . . . state a personal opinion as to the justness of the cause").

In *Jones*, this Court vacated the defendant's death sentence and awarded a new sentencing hearing after holding that the trial court "abused its discretion by affording the prosecution undue latitude in its closing arguments at sentencing." 355 N.C. at 135, 558 S.E.2d at 109. Two distinct sets of remarks were found by the Court in *Jones* to exceed the bounds of permissible argument. First, the prosecutor had been permitted, over the defendant's objection, to state the following:

> [PROSECUTOR]: Thank you, judge. The United States of America, a great country, indeed around the world for its freedoms: freedom of speech, freedom of privacy in your own home. But with those freedoms comes individual responsibility that every citizen of this country must realize; that to have these freedoms, one is responsible for their own conduct; one is responsible for their own behavior.

A year ago the Columbine shootings; five years ago Oklahoma City bombings. When this nation faces such tragedy—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[PROSECUTOR]: —the laws of this country come in to bring order to that tragedy, to speak to that tragedy. Here we are addressing a tragedy of a man's life. The tragedy not of this defendant, the tragedy of [the victim] . . . .

*Id.* at 132 n.2, 558 S.E.2d at 107 n.2. Second, the trial court did not intervene *ex mero motu* to prevent the prosecutor from describing the defendant as a "quitter," a "loser," "worthless," "as mean as they come," and "lower than the dirt on a snake's belly." *Id.* at 133, 558 S.E.2d at 107.

In sharp contrast with *Jones*, the case at bar presents this Court with a closing argument well within the "wide latitude" of what is permissible, as the prosecutor merely sought to fulfill the well-recognized "duty to advocate zealously that the facts in evidence warrant imposition of the death penalty." *Williams*, 350 N.C. at 25, 510 S.E.2d at 642 (citing *State v. Conner*, 345 N.C. 319, 334, 480 S.E.2d 626, 633, *cert. denied*, 522 U.S. 876 (1997)). Thus, the prosecutor was advocating the State's position as to the Issues and Recommendation as to Punishment form rather than expressing a personal opinion or desire that defendant be sentenced to death. Defendant's argument is without merit, and consequently, his related assignments of error are overruled.

### B. *Trial Court's Instructions on Mitigating Circumstances*

**[9]** Defendant contends that the trial court gave an incorrect definition of mitigating circumstances in its final charge to the jury at the close of the penalty proceeding. He challenges the following portion of the trial court's final charge to the jury at the conclusion of the penalty proceeding, although no timely objection was raised at the charge conference or made contemporaneously with the instructions:

A mitigating circumstance is a fact or group of facts which do not—which do not constitute a justification or excuse for a killing or reduce it to a lesser degree of crime than first degree murder, but which may be considered as extenuating or reducing the moral culpability of the killing or as making it less deserving of the extreme punishment than other first degree murders.

Our law identifies several possible mitigating circumstances; however, in considering issue two, it is your duty—it would be your duty to consider as a mitigating circumstance any aspect of the defendant's character or record or any circumstances of this murder that the defendant contends is a basis for a sentence less than death and to consider any other circumstances arising from the evidence which you deem to have mitigating value.

Because defendant did not object to the trial court's jury instructions, this assignment of error was not preserved for appellate review. *See State v. Hardy*, 353 N.C. 122, 131, 540 S.E.2d 334, 342 (2000), *cert. denied*, 534 U.S. 840 (2001).

Alternatively, defendant asserts plain error; however, this Court has repeatedly upheld virtually identical instructions. *See, e.g., State v. Williams*, 350 N.C. 1, 32-34, 510 S.E.2d 626, 647, *cert. denied*, 528 U.S. 880 (1999); *State v. Harden*, 344 N.C. 542, 564, 476 S.E.2d 658, 669-70 (1996), *cert. denied*, 520 U.S. 1147 (1997); *State v. Skipper*, 337 N.C. 1, 52-53, 446 S.E.2d 252, 280-81 (1994), *cert. denied*, 513 U.S. 1134 (1995), *superseded by statute on other grounds*, N.C.G.S. § 15A-2002, *as recognized in State v. Price*, 337 N.C. 756, 448 S.E.2d 827 (1994). Thus, there was no error in the trial court's instructions, plain or otherwise. Accordingly, defendant's assignment of error is overruled.

### C. *Ineffective Assistance of Counsel Claim Concerning (f)(7) Mitigator ("the age of the defendant at the time of the crime")*

[10] Although the trial court properly submitted and instructed the jury on the (f)(7) mitigating circumstance, defendant claims ineffective assistance of counsel because his trial counsel did not object to a number of questions asked by the prosecution and the trial court during jury selection concerning prospective jurors' "sympathy" for defendant on account of his age. Further, defendant contends that these questions were prejudicial because they prevented the jury from considering the (f)(7) mitigating circumstance, defendant's age at the time of the murder, in its sentencing deliberations. *See* N.C.G.S. § 15A-2000(f)(7) (2007).

Among other questions cited by defendant, the prosecutor asked prospective jurors whether they would "be sympathetic to this defendant because of his age"; whether they agreed "that the law must apply the same to everyone regardless of their age, sex, and

race"; and whether they agreed that "a decision based upon somebody's age, race, or sex would be unlawful." At one point during the State's jury voir dire questioning, the trial court interjected and asked prospective jurors whether they understood that "deciding this case based on a person's age, race, religion, or sex" would be "morally wrong" in addition to being "unlawful." The prosecutor thereafter characterized "basing [a] decision on sex, age, or race" as both "unlawful" and "immoral" when questioning prospective jurors.

This Court has long recognized the two components of a defendant's ineffective assistance of counsel claims brought under the Sixth and Fourteenth Amendments to the United States Constitution, as set forth in *Strickland v. Washington. State v. Goss*, 361 N.C. 610, 623, 651 S.E.2d 867, 875 (2007) (citations omitted); *State v. Campbell*, 359 N.C. 644, 690, 617 S.E.2d 1, 30 (2005) (citations omitted), *cert. denied*, 547 U.S. 1073 (2006). First, defendant must demonstrate that his trial counsel's performance was "deficient," such that the errors committed were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Second, defendant is required to show prejudice resulting from trial counsel's "deficient performance," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

This Court has previously held that a prosecutor may " 'inquir[e] into the sympathies of prospective jurors in the exercise of [the State's] right to secure an unbiased jury.' " *See State v. Anderson*, 350 N.C. 152, 170-71, 513 S.E.2d 296, 308, (quoting *State v. McKoy*, 323 N.C. 1, 15, 372 S.E.2d 12, 19 (1988), *sentence vacated on other grounds*, 494 U.S. 433 (1990)), *cert. denied*, 528 U.S. 973 (1999). Defendant contends that the questions asked of prospective jurors by the State and the trial court in the present case were not permissible inquiries into the bias of prospective jurors. Instead, in effect defendant argues that these were "hypothetical questions involving the existence of a mitigating circumstance" and thus, impermissible because they were "designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts." *See id.* at 170, 513 S.E.2d at 307 (citations and internal quotation marks omitted).

**STATE v. MURRELL**

[362 N.C. 375 (2008)]

It is far from clear that the questions asked by the prosecutor and the trial court were directed toward the (f)(7) mitigating circumstance of defendant's age rather than toward any bias which may have affected prospective jurors during the *guilt phase* of the trial because of defendant's age. Regardless, we are not persuaded that the performance of defendant's trial counsel "fell below an objective standard of reasonableness" as is required to show that counsel's performance was deficient. *See Strickland*, 466 U.S. at 687-88. Indeed, as defendant acknowledges, his trial counsel made repeated references to defendant's youth throughout the penalty proceeding and stated the following in closing argument:

> The defendant's age at the time of the crime was a mitigating factor. He was twenty-four. He had not finished college. The State wants you to believe he had apartments and lived with women, but what was he doing? He was living in somebody's dorm room. He had lived with various people that kicked him out. And I would contend that that's not evidence that he had established some home and was living through life as a mature person. And I think you can consider his age. That is a statutory mitigating factor. He was young.

Moreover, as the trial court submitted the (f)(7) mitigating circumstance and did not err in its instructions to the jury on this mitigator, there is nothing in the trial transcript and record to support a conclusion that defendant's trial counsel did not act reasonably to ensure the jury fully considered defendant's age as a mitigator in its sentencing deliberations.

Because it would have been reasonable for trial counsel to interpret the questions asked of prospective jurors concerning defendant's age as permissible inquiries into potential bias, and because counsel sufficiently advocated during the penalty proceeding that the jury find the (f)(7) mitigating circumstance, we conclude that defendant has not demonstrated the first component of his ineffective assistance of counsel claim—that counsel's performance was deficient. Consequently, defendant's claim is without merit, and his related assignments of error are overruled.

### D. *Trial Court's Instructions on (e)(6) Aggravator (that "[t]he capital felony was committed for pecuniary gain")*

[11] Defendant asserts plain error and a violation of his rights to due process in the following instruction given by the trial court concern-

ing the (e)(6) aggravating circumstance—whether the murder "was committed for pecuniary gain":

> A murder is committed for pecuniary gain if the defendant, when he commits it, has obtained or intends or expects to obtain money or some other thing, in this case the victim's automobile, which can be valued in money, either as compensation for committing it or as a result of the death of the victim.
>
> *If you find from the evidence beyond a reasonable doubt that when the defendant killed the victim, the defendant took or intended to take the victim's automobile, then you would find this aggravating circumstance* and would so indicate by having your foreperson write yes in the space after this aggravating circumstance on the issues and recommendation form.

(Emphasis added.) *See* N.C.G.S. § 15A-2000(e)(6) (2007). The jury subsequently found the (e)(6) aggravator to exist.

Defendant contends that the italicized portion of the above instruction relieved the State of its burden of proving that the murder was committed *for the purpose* of pecuniary gain and of thereby showing that "the taking was [not] a mere act of opportunism committed after a murder was perpetrated for another reason." *See State v. Maske,* 358 N.C. 40, 54, 591 S.E.2d 521, 530 (2004). However, this Court has rejected several previous challenges to virtually identical instructions. *See Barden,* 356 N.C. at 383, 572 S.E.2d at 149-50 (citing, *inter alia, State v. Davis,* 353 N.C. 1, 35-37, 539 S.E.2d 243, 266-67 (2000), *cert. denied,* 534 U.S. 839 (2001)). In the instant case, as was true in the cases cited above, the trial court sufficiently informed the jury regarding the circumstances which would support a finding of "some causal connection between the murder and the pecuniary gain at the time the killing occur[red]," *Maske,* 358 N.C. at 54, 591 S.E.2d at 530 (citations omitted), with its instructions that the pecuniary gain must have been "[obtained] as compensation for committing [the murder]" or "[intended or expected] as a result of the death of the victim."

Thus, defendant has failed to demonstrate any error in these instructions, much less plain error. Defendant's assignment of error is overruled, as it is without merit.

Alternatively, defendant claims his trial counsel was ineffective, depriving defendant of his Sixth and Fourteenth Amendment rights to the effective assistance of counsel, by failing to note a timely objec-

STATE v. MURRELL

[362 N.C. 375 (2008)]

tion to the trial court's instructions on the (e)(6) aggravating circumstance.[5] Since we have found no error in the challenged instructions, defendant has not demonstrated that his trial counsel's performance "fell below an objective standard of reasonableness," and his claim is without merit as a result. *See Strickland*, 466 U.S. at 687-88. Thus, defendant's assignment of error is overruled.

## IV. DEFENDANT'S MOTION FOR APPROPRIATE RELIEF

[12] On 21 September 2007, defendant filed with this Court a Motion for Appropriate Relief from his sentence of death pursuant to Article 89 of the Criminal Procedure Act. *See* N.C.G.S. §§ 15A-1415, -1418 (2007). Through this motion, defendant assigns error to (1) the allegedly false testimony of State's witness Bennie Cameron; (2) the allegedly false testimony of State's witness Alonzo Dingle; and (3) the prosecutors' closing remarks, trial strategy, and direct examination pertaining to victim impact evidence. Moreover, defendant effectively contends that each assignment of error resulted in an invalid sentence as a matter of law and in his prayer for relief asks us to vacate his sentence of death or, in the alternative, remand the case to the trial court for an evidentiary hearing on these claims. *See id.* § 15A-1415(b)(8). This Court allowed oral argument on defendant's motion contemporaneously with argument concerning his direct appeal, and we have determined that the merits of this motion can be decided based upon the materials before us. *See id.* § 15A-1418(b).

We note at the outset that a capital defendant's Motion for Appropriate Relief filed pursuant to N.C.G.S. § 15A-1418 would ordinarily be subject to denial on statutory procedural grounds if "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." *Id.* § 15A-1419(a)(3) (2007). The fact that each of defendant's three stated grounds for relief are based upon assignments of error contained in the record on appeal, and therefore, could have been presented by argument in defendant's brief, demonstrates that defendant "was in a position to adequately raise the ground[s] or issue[s] underlying the present motion" on direct appeal. *Id.* In *State v. Price*, this Court applied section 15A-1419(a)(3) to a defendant's Motion for Appropriate Relief filed during the pendency of his direct appeal, stating:

---

5. Defense counsel did object to the *submission* of the (e)(6) aggravating circumstance to the jury, but not to the precise wording of the trial court's jury instruction.

Motions for appropriate relief generally allow defendants to raise arguments that could not have been raised in an original appeal, such as claims based on newly discovered evidence and claims based on rights arising by reason of later constitutional decisions announcing new principles or changes in the law. We agree with the State that statutes governing motions for appropriate relief were not intended to circumvent the orderly briefing of arguments on appeal. Motions for appropriate relief may not be used to add to an appeal new arguments which could have been raised in the briefs originally filed. Both of the arguments now raised by defendant in the motion for appropriate relief could have been raised in his original appeal. Therefore, defendant's motion for appropriate relief is subject to being dismissed.

331 N.C. 620, 630, 418 S.E.2d 169, 174 (1992) (internal citation omitted), *sentence vacated on other grounds*, 506 U.S. 1043 (1993).

In *Price*, this Court exercised its discretion to reach the merits of the defendant's claims notwithstanding the applicability of section 15A-1419(a)(3). *See* 331 N.C. at 630, 418 S.E.2d at 174-75. In fact, the version of N.C.G.S. § 15A-1419(b) which was applicable when *Price* was decided expressly provided for such an exercise of discretion "in the interest of justice and for good cause shown." *See* Act of June 21, 1996, ch. 719, sec. 2, 1995 N.C. Sess. Laws (Reg. Sess. 1996) 389, 391. However, the General Assembly has since amended section 15A-1419(b), which currently provides:

(b) The court *shall* deny the motion under any of the circumstances specified in this section, *unless* the defendant can demonstrate:

> (1) Good cause for excusing the grounds for denial listed in subsection (a) of this section and can demonstrate actual prejudice resulting from the defendant's claim; or

> (2) That failure to consider the defendant's claim will result in a fundamental miscarriage of justice.

N.C.G.S. § 15A-1419 (2007) (emphasis added) (as amended by ch. 719, sec. 2, 1995 N.C. Sess. Laws (Reg. Sess. 1996) at 391-92). Thus, our state's appellate courts may excuse the grounds for denial set forth in section 15A-1419(a) *only if* a defendant can demonstrate (1) "good cause" resulting in "actual prejudice," as defined by N.C.G.S.

§ 15A-1419(c), (d), *or* (2) that a "fundamental miscarriage of justice," as defined by N.C.G.S. § 15A-1419(e), would otherwise result. ·

Because defendant filed his brief *after* filing his Motion for · Appropriate Relief and incorporates by reference in his brief each of the three stated grounds for relief set forth in his motion, *and* because defendant was evidently acting upon a good faith misunderstanding of the law, we hold that defendant, under these particular circumstances, *did* adequately raise on appeal each of the grounds underlying the motion in his brief. *See* N.C.G.S. § 15A-1419(a)(3). After careful review of defendant's several arguments, we find they are all meritless. Accordingly, we overrule defendant's related assignments of error and deny his Motion for Appropriate Relief.

## A. *State's Witness Bennie Cameron*

[13] Defendant first contends that the prosecution allowed State's witness Bennie Cameron to perjure himself concerning his prior convictions, current charges, and discussions with the Durham County District Attorney's office. Defendant also alleges that he received ineffective assistance of counsel with respect to the impeachment of Cameron on cross-examination, that defendant's right to effective assistance of conflict-free counsel was violated, and that defendant was sentenced to death upon materially false and unreliable information in violation of his state and federal constitutional rights. Defendant's arguments are without merit.

> [I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. Further, with regard to the knowing use of perjured testimony, the Supreme Court has established a standard of materiality under which the knowing use of perjured testimony requires a conviction to be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Thus, [w]hen a defendant shows that testimony was in fact false, material, and knowingly and intentionally used by the State to obtain his conviction, he is entitled to a new trial.

*State v. Williams*, 341 N.C. 1, 16, 459 S.E.2d 208, 217 (1995) (alterations in original) (internal quotation marks and citations omitted), cert. denied, 516 U.S. 1128 (1996).

Defendant asserts that Bennie Cameron testified falsely concerning "pending charges in Durham." At trial, defense counsel questioned Cameron concerning charges filed against "Kevin Jermaine McAdoo," which defendant contends has been identified by fingerprint comparison as an alias of Cameron. Defense counsel asked Cameron if he had any pending charges in Durham. He responded that he did not. This statement was in fact true, even assuming that Cameron and McAdoo are the same person, since the supporting documentation provided by defendant and the testimony at trial show that the charges against McAdoo were dismissed with leave for failure to appear. Although the charges were subject to reinstatement, they were not pending at the time of the challenged testimony.

Even assuming, *arguendo*, that this testimony was false, defendant has presented no supporting evidence for his assertion that the prosecution "knowingly and intentionally" allowed Cameron to testify falsely concerning these matters. Moreover, even had sufficient evidence been provided by affidavit or other supporting documentation to demonstrate such knowledge by the prosecutors, Cameron's testimony on this peripheral issue concerning charges dismissed in another district attorney's jurisdiction was simply not material. *See State v. Abraham*, 338 N.C. 315, 353, 451 S.E.2d 131, 151 (1994) (holding that counsel is not allowed to cross-examine witnesses on pending charges). Unlike *State v. Prevatte*, 346 N.C. 162, 163-64, 484 S.E.2d 377, 378 (1997), in which the State's witness faced pending charges within the *same* jurisdiction in which he testified, any charges pending against Cameron were being handled in a different jurisdiction, and defendant provides no supporting documentation of any discussion between the two district attorneys' offices to demonstrate that Cameron's testimony was biased in this respect. Moreover, this case is unlike *Davis v. Alaska*, 415 U.S. 308 (1974), in which the trial court had refused to allow defense counsel to question a witness as to his probationary status when the witness *was afraid he might be charged with the crime for which the defendant was on trial. Id.* at 312-14. In the instant case, there is no indication that Cameron feared being charged with the victim's murder. Thus, Cameron's allegedly false testimony was clearly not material to defendant's trial.

**[14]** Defendant also argues that he was denied effective assistance of counsel during the cross-examination of Cameron. We disagree. Defense counsel's performance at trial was far from deficient. Counsel not only confronted Cameron about his numerous prior convictions, but also questioned him concerning the charges under his

alleged alias and any conversations with the district attorney regarding the disposition of the alleged charges against him. Defense counsel's cross-examination of Cameron spanned twenty-nine pages of transcript and we cannot say that her performance in impeaching Cameron was deficient. Thus, defendant's ineffective assistance of counsel claim must fail. *See Strickland*, 466 U.S. at 687.

**[15]** Defendant argues that he was denied effective assistance of counsel because it was revealed during defense counsel Lisa Costner's cross-examination of Cameron that she had represented him on a previous charge that resulted in a conviction. However, the transcript also reveals that Costner did not recall Cameron or her representation of him, nor did she discuss defendant's case with Cameron. Defendant did not object at trial to this potential conflict of interest and has failed to show that this asserted conflict of interest " 'adversely affected his lawyer's performance.' " *State v. Walls*, 342 N.C. 1, 39-40, 463 S.E.2d 738, 757 (1995) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)), *cert. denied*, 517 U.S. 1197 (1996). As noted above, Costner sufficiently cross-examined Cameron and adequately raised issues concerning his credibility. Thus, defendant's arguments relating to Cameron's testimony lack merit, and his related assignments of error are overruled.

### B. State's Witness Alonzo Dingle

**[16]** Defendant next contends that the prosecution was permitted to present false testimony from State's witness Alonzo Dingle concerning whether he observed blood on defendant's person when defendant first arrived at Dingle's apartment on the night of the murder. According to Detective Elmes' report of his unrecorded interview with Dingle, Dingle told investigators that he *had* observed blood on defendant's person at this point in time, whereas in Dingle's recorded interview he indicated that this was not the case and he had not observed any blood until defendant later removed the body from the passenger side of the vehicle. Although Dingle's statements are inconsistent, it cannot be said that the prosecution knowingly submitted false testimony for the jury's consideration based solely on the fact that the prosecutors submitted evidence which may have conflicted with Dingle's prior statements. As this Court has stated, "[T]here is a difference between the knowing presentation of false testimony and knowing that testimony conflicts in some manner. It is for the jury to decide issues of fact when conflicting information is elicited by either party." *State v. Allen*, 360 N.C. 297, 305, 626 S.E.2d

271, 279 (citation omitted), *cert. denied*, —— U.S. ——, 127 S. Ct. 164, 166 L. Ed. 2d 116 (2006).

**[17]** Moreover, defendant's assertion that he was denied effective assistance of counsel because his counsel failed to properly cross-examine Dingle concerning his statement and failed to request a jury instruction on accomplice testimony must fail. At trial, defense counsel questioned Dingle concerning his recollection of the events in a manner designed to raise a suspicion in jurors' minds that Dingle's account was fictional. Counsel further impeached Dingle with his conflicting accounts of these events. Thus, counsel's performance met the constitutionally required "objective standard of reasonableness." *See Strickland*, 466 U.S. at 687-88. Additionally, even had counsel requested a jury instruction on accomplice testimony, it would not have been a proper instruction. There was no evidence that Dingle was an accessory before the fact, and "[e]vidence that a witness was an accessory after the fact does not subject [the witness's] testimony to rules relating to accomplice testimony." *State v. Cabey*, 307 N.C. 496, 501, 299 S.E.2d 194, 197 (1983). Moreover, as defendant was not entitled to such an instruction, the failure of the trial court to give the instruction could not constitute plain error. Accordingly, defendant's assignment of error related to Dingle's testimony is overruled.

### C. Prosecutors' Closing Argument Remarks, Trial Strategy, and Direct Examination Pertaining to Victim Impact Evidence

**[18]** Finally, defendant has raised several assignments of error pertaining to victim impact evidence presented by the State during the penalty proceeding. Defendant first challenges the prosecutor's remarks during penalty proceeding closing argument that the victim's family placed numerous telephone calls to his cellular phone following his death. The prosecutor argued:

MR. O'NEILL: And what did Alonzo Dingle tell you? . . . I heard the phone, some phone kept ringing, kept ringing, kept ringing, kept ringing. That was Matthew's family trying to find their kid—

MS. COSTNER: Objection.

THE COURT: Overruled.

MR. O'NEILL: —trying to find their baby.

Defendant argues that this was patently false, as discovery records show that all of the calls placed to the victim's cellular phone were not made by concerned family members, but by friends. "This Court has articulated a two-part analysis for determining whether the trial court abused its discretion in such cases. '[T]his Court first determines if the remarks were improper . . . . Next, we determine if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court.' " *Peterson*, 361 N.C. at 606-07, 652 S.E.2d at 229 (quoting *Jones*, 355 N.C. at 131, 558 S.E.2d at 106 (alterations in original)). Even assuming, *arguendo*, that the prosecutor's remarks were improper, defendant cannot show that the trial court's failure to sustain his objection was prejudicial. The challenged remarks were obviously made for the purpose of showing the love the victim's family felt toward him. Moreover, considering (1) the evidence detailed above as to the impact of the victim's death on his family, (2) the fact someone was concerned of his whereabouts as indicated by the ringing of his cellular phone, and (3) the trial court's instruction to the jury that "if your recollection of the evidence differs from that of the Court or of the district attorneys, you are to rely solely upon your recollection of the evidence in your deliberations," defendant cannot demonstrate prejudice.

[19] Additionally, defendant asserts that the prosecution tried to "keep the victim's attempt to purchase marijuana from the jury by eliciting incomplete information from Detective Rowe" and by arguing to the jury that defense counsel's exploration of the issue was an attempt to "smear the victim." However, the jury was allowed to hear the relevant evidence through defense counsel's cross-examination of Detective Rowe, in which Detective Rowe stated affirmatively that he had information that "the victim was trying to purchase drugs at the time that he was shot." Thus, even had the prosecutor attempted to "conceal" this evidence, it came before the jury and defendant cannot show prejudice.

[20] Finally, defendant asserts that the prosecutor posed questions assuming facts not in evidence by asking witnesses about medication used by the victim's father. The prosecution asked both the victim's stepmother and his grandmother whether his father was taking medication and, if so, why. On both occasions, the trial court sustained defense counsel's objection to the question of why the victim's father was taking medication. "This Court has held that where the trial court sustains defendant's objection, he has no grounds to except,

and there is no prejudice." *State v. Robinson*, 355 N.C. 320, 341, 561 S.E.2d 245, 259 (citation omitted), *cert. denied*, 537 U.S. 1006 (2002). Thus, defendant's argument is without merit. Defendant's related assignments of error are overruled, and his Motion for Appropriate Relief is denied.

## V.  PRESERVATION ISSUES

Defendant assigns error to the trial court's instruction to the jury on the (f)(2) mitigating circumstance, contending it was plainly erroneous for the trial court to state that being "under the influence of mental or emotional disturbance," *see* N.C.G.S. § 15A-2000(f)(2) (2007), is similar to acting "in the heat of passion upon adequate provocation." This Court has previously upheld the language used by the trial court. *See State v. Wilkinson*, 344 N.C. 198, 218-20, 474 S.E.2d 375, 385-87 (1996). Although defendant bases his challenge of these instructions on apparently novel grounds, his bare contention that the trial court's characterization is unfounded does not compel us to overrule our previous holding that the trial court's instruction "clearly did not prevent the jury from considering any evidence tending to support this mitigating circumstance." *Id.* at 219-20, 474 S.E.2d at 386-87. Accordingly, we overrule defendant's assignment of error as without merit.

Defendant also contends that the trial court's instructions to the jury on the (f)(2) ("mental or emotional disturbance") and (f)(6) (impaired capacity) mitigating circumstances were plainly erroneous and violated his state and federal constitutional rights because these instructions limited the evidence the jury could consider in support of these circumstances. See N.C.G.S. § 15A-2000(f)(2), (f)(6) (2007). We have reviewed defendant's argument and decline to overrule this Court's previous holding that this argument is without merit. *See State v. Carroll*, 356 N.C. 526, 552, 573 S.E.2d 899, 915-16 (2002), *cert. denied*, 539 U.S. 949 (2003).

Additionally, defendant argues the following: (1) the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad; (2) the trial court erred in instructing the jury to answer "yes" for Issue Three of the Issues and Recommendation as to Punishment form even if the jury found that the mitigating and aggravating circumstances were of equal weight; (3) the trial court erred in instructing jurors that, in considering Issues Three and Four of the Issues and Recommendation as to Punishment form, they "may" consider the mitigating circumstances

found in response to Issue Two; (4) the trial court erred in instructing jurors that they could ignore nonstatutory mitigating circumstances if they deemed the evidence to have no mitigating value; and (5) the death penalty is inherently cruel and unusual, and North Carolina's capital sentencing procedure is unconstitutionally vague and overbroad. After reviewing defendant's several arguments, we decline to overrule this Court's numerous holdings that these contentions are all meritless. *State v. Duke*, 360 N.C. 110, 136-42, 623 S.E.2d 11, 28-32 (2005), *cert. denied*, —— U.S. ——, 127 S. Ct. 130, 166 L. Ed. 2d 96 (2006).

## VI. PROPORTIONALITY REVIEW

[21] Having determined that defendant's trial and capital sentencing proceeding were free of prejudicial error, we must further determine: "(1) whether the record supports the aggravating circumstances found by the jury and upon which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the facts of the crime and the defendant." *State v. Raines*, 362 N.C. 1, 24, 653 S.E.2d 126, 141 (2007) (citing N.C.G.S. § 15A-2000(d)(2) (2005)).

The jury found four aggravating circumstances: (1) the murder was committed for pecuniary gain; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder was committed while defendant was engaged in robbery with a dangerous weapon; and (4) the murder was committed while defendant was engaged in first-degree kidnapping. *See* N.C.G.S. § 15A-2000(e)(5), (e)(6), (e)(9) (2007). We find the record supports each of these aggravating circumstances.

First, the testimony of Bennie Cameron supported the jury's finding that defendant committed the murder for pecuniary gain— namely, the victim's vehicle—since defendant stated to Cameron before 21 August 2003 that he would rob someone, put the individual in the trunk of his or her own vehicle, and take the vehicle to Durham, where defendant knew of a "chop shop," referring to "a place where stolen automobiles are stripped of salable parts." *Merriam-Webster's* at 202.

Additionally, the State offered (1) considerable testimony from those who associated with defendant before the murder that defendant apparently intended to rob someone for money; (2) defendant's

statements to Mangus Daniels afterward that he had robbed someone at gunpoint; and (3) defendant's statement to investigators that he had taken money from the victim. Thus, the record supports the (e)(5) aggravating circumstance as to robbery with a dangerous weapon to obtain the victim's money. *See* N.C.G.S. § 14-87(a) (2007).

Defendant's statements to investigators, in conjunction with what he related to several acquaintances, tended to prove that the victim—while he remained alive—was unlawfully transported in his own vehicle without his consent and for the purpose of robbery or the infliction of serious bodily harm. This finding would support the (e)(5) aggravating circumstance as to first-degree kidnapping. *See id.* § 14-39 (2007) (providing that "the offense is kidnapping in the first degree" if the victim was "not released by the defendant in a safe place" or was "seriously injured").

Finally, defendant's statement to investigators tended to show that defendant, although he considered taking the victim to a hospital after the initial discharge of the handgun, fired a second, fatal shot at the helpless victim as he lay upside down on the front passenger side of the vehicle and after he begged defendant to put him out of his misery. This evidence, in turn, supports the jury's finding of the (e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel.

We find no indication in the record that the sentence of death recommended by the jury was imposed "under the influence of passion, prejudice, or any other arbitrary factor." *See id.* § 15A-2000(d)(2); *Raines,* 362 N.C. at 25, 653 S.E.2d at 141. "In such circumstances we will not disturb the jurors' weighing of aggravating and mitigating circumstances." *Raines,* 362 N.C. at 25, 653 S.E.2d at 141.

Lastly, we determine whether defendant's sentence is proportionate, considering both the individual defendant and the crime for which he was convicted. *See id.* "Ultimately, proportionality review rests upon the experienced judgments of the members of the Court." *Goss,* 361 N.C. at 629, 651 S.E.2d at 879 (citing *State v. Elliott,* 360 N.C. 400, 425, 628 S.E.2d 735, 752, *cert. denied,* —— U.S. ——, 127 S. Ct. 505, 166 L. Ed. 2d 378 (2006)). "In its determination, the Court must compare defendant's case with all similar cases in this jurisdiction, though we are not bound to cite each of these." *See id.* at 629, 651 S.E.2d at 879 (citing *State v. Cummings,* 361 N.C. 438, 477-78, 648 S.E.2d 788, 812 (2007), *cert. denied,* —— U.S. ——, 128 S. Ct. 1888, 170 L. Ed. 2d 760 (2008)).

This Court has previously found a sentence of death disproportionate in only eight cases. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

Only in *Stokes* and *Bondurant* did the juries find the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. However,

> [i]n *Stokes*, the defendant was seventeen years old and the only one of four assailants to receive the death penalty. In *Bondurant*, the defendant showed immediate remorse for his actions and even directed the victim's transport to the hospital, hoping to see the victim live.

*Cummings*, 361 N.C. at 478, 648 S.E.2d at 812 (citations omitted). In contrast, in the case now before us, defendant was twenty-four years old at the time of the murder and was also the sole assailant. Moreover, although defendant stated to investigators that he killed the victim only because the victim repeatedly pleaded with him to do so, none of defendant's subsequent actions following the victim's death demonstrated any remorse. In fact, defendant took considerable steps to conceal his involvement in the murder—including abandoning the body in a remote location outside of the state.

Accordingly, after careful consideration, we find the sentence of death proportionate in light of this defendant and the crime for which he was convicted.

## CONCLUSION

All remaining assignments of error presented by defendant but not set forth in his brief or argued on appeal are deemed abandoned. N.C. R. App. P. 28(b)(6); *see also Goss*, 361 N.C. at 630, 651 S.E.2d at 879 (citations omitted). We conclude that defendant received a fair trial and sentencing proceeding, that his convictions and sentence were free of error, and that the sentence of death is not dispropor-

tionate to the crime for which he was convicted. As detailed above, we also deny defendant's Motion for Appropriate Relief.

NO ERROR; MOTION FOR APPROPRIATE RELIEF DENIED.